THE HONORABLE JAMES L. ROBART

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**SEATTLE DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ANDY SHIN FONG CHEN AND AERO SPACE
PORT INTERNATIONAL GROUP, INC.

Defendants, and

NORTH AMERICAN FOREIGN TRADE ZONE
INDUSTRIES LLC, WASHINGTON
ECONOMIC DEVELOPMENT CAPITAL LLC,
WASHINGTON ECONOMIC DEVELOPMENT
CAPITAL II LLC, EVF  INC., MOSES LAKE
96000 BUILDING LLC,  SUN BASIN
ORCHARDS LLC, PIA LLC, JOHN CHEN, TOM
CHEN, BOBBY CHEN, and HEIDI CHEN,

Relief Defendants.

Case No. 2:17-cv-00405-JLR

**MOTION OF SECURITIES
AND EXCHANGE
COMMISSION FOR
SUMMARY JUDGMENT ON
ALL LIABILITY CLAIMS
AGAINST THE
DEFENDANTS**

**Note on motion calendar:**
December 28, 2018

**THE SECURITIES AND EXCHANGE COMMISSION'S**
**MOTION AND MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT ON LIABILITY ISSUES**

Securities and Exchange Commission's
Memorandum in Support of Its Motion for
Summary Judgment

*SEC v. Chen*, 2:17-cv-00405-JLR

1
2
3

# TABLE OF CONTENTS

OVERVIEW OF THE CASE.................................................................................1

    1.  Background on EDC III and the EB-5 Program.................................2

    2.  The Primary Misrepresentations and Omissions at Issue..................3

LEGAL STANDARDS ......................................................................................5

    1.  Standard for Summary Judgment .....................................................5

    2.  Elements of the Securities Law Claims in the Complaint.................7

THE UNDISPUTED FACTS PROVING THE  ELEMENTS OF THE
SEC'S LIABILITY CLAIMS ............................................................................7

    1.  The Defendants Made Misrepresentations or Omissions in
       Connection with the Sale of Securities in Interstate
       Commerce.........................................................................................7

        a.  The Undisputed Facts with Respect to
           Misrepresentations and Omissions ...........................................7

        b.  The Undisputed Facts Show that the
           Misrepresentations Were in Connection with the
           Offer or Sale of Securities in Interstate Commerce...............12

    2.  It Is Indisputable that the Misrepresentations and
       Omissions Were Material .................................................................14

    3.  It Is Indisputable that the Defendants Acted with the
       Required Mental State .....................................................................18

        a.  The Scienter Standard..............................................................18

        b.  The Negligence Standard .........................................................19

        c.  The Undisputed Facts Show that the Defendants
           Intended this Fraud from the Outset.......................................20

    4.  The Defendants' Conduct Also Constituted an Illegal
       Scheme to Defraud .........................................................................24

CONCLUSION ...............................................................................................24

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

i

*SEC v. Chen*, 2:17-cv-00405-JLR

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Aaron v. SEC,*
   446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980)..........................7

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986)...................................................................5, 6

*Arthur Lipper Corp. v. S.E.C.,*
   547 F.2d 171, 181 (2d Cir. 1976)……………………………………… 19

*Chadbourne & Parke LLP v. Troice,*
   571 U.S. 377, 404 (2014) …………………………………………………… 12

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336, 341, (2005) ………………………………………………... 11

*El Dabe v. Calavo Growers, Inc.,*
   719 F.App'x 607, 608 (9th Cir. 2018) ……………………………………… 18

*Easley v. City of Riverside,*
   890 F.3d 851,859 (9th Cir 2018)……………………………….........……… 6

*Ernst & Ernst v. Hochfelder,*
   425 U.S. 185, 193 n. 12 (1976) ………………………………………………… 18

*Farrakhan v. Gregoire,*
   590 F.3d 989, 1002 (9th Cir.), on reh'g en banc, 623 F.3d 990 (9th Cir. 2010)..10

*Garber v. US,*
   709 F.App'x 485 (9th Cir.. 2018) …………………………………………… 10

*Hollinger v. Titan Capital Corp.,*
   914 F.2d 1564 (9th Cir. 1990)  ……………………………………………….7, 18

*In re Daou Sys., Inc.,*
   411 F.3d 1006, 1015 (9th Cir. 2005). ………………………………………... 18

*Kennedy v. Applause,* Inc.,
   90 F.3d 1477, 1481 (9th Cir 1989)………………………………………… 6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574, 586 (1986)………………………………………………...... 6

*Pittsburgh Terminal Corp. v. Baltimore & Ohio R. Co.,*
   680 F.2d 933, 942 (3d Cir. 1982) ……………………………………….. 19

*Schueneman v. Arena Pharmaceuticals,*
   840 F.3d 698, 705 (9th Cir. 2016) ……………………………………… 18

Securities and Exchange Commission's                ii                *SEC v. Chen*, 2:17-cv-00405-JLR
Memorandum in Support of its Motion for
Summary Judgment

*SEC v. Abellan*,
  674 F. Supp. 2d 1213, 1217 (W.D. Wash. 2009) …………………………… 6

*SEC v. Aqua-Sonic Products Corp.*,
  687 F.2d 577 (2d Cir.), *cert. denied,* 459 U.S. 1086, (1982) ………………… 13

*SEC v.Blockvest LLC,*
  2018 WL 4955837 (S.D. Ca. Oct. 5, 2018) ……………………………………… 20

*SEC v. Cole,*
  2015 WL 5737275 (S.D.N.Y. Sept. 19, 2015) …………………………………… 20

*SEC v. Cooper,*
  142 F. Supp. 3d 302, 316 (D.N.J. 2015) ………………………………………… 10

*SEC  v. Dain Rauscher, Inc.,*
  254 F.3d 852 (9th Cir. 2001) ………………………………………………………7, 20

*SEC v. Falstaff Brewing Corp.,*
  629 F.2d 62, 77 (D.C. Cir. 1980) ………………………………………………… 18

*SEC v. First Pac. Bancorp,*
  142 F.3d 1186, 1191 (9th Cir. 1998),  ……………………………………………19

*SEC v. Fraser,*
  2009 WL 2450508, at *9 (D. Ariz. Aug. 11, 2009) ……………………………… 24

*SEC v. Goldfield Deep Mines Co. of Nevada,*
  758 F.2d 459, 464 (9th Cir. 1985) ………………………………………………… 13

*SEC v. Hughes Capital Corp.,*
  124 F.3d 449 (3d Cir. 1997)………………………………………………………… 7

*SEC v. Liberty Capital Group., Inc.,*
  75 F. Supp. 2d 1160, 1163 (W.D. Wash. 1999)   …………..……………………… 6

*SEC v. Liu,* 262 F. Supp. 3d 957, 971–72 (C.D. Cal. 2017), aff'd, No. 17-55849,
  2018 WL 5308171 (9th Cir. Oct. 25, 2018) ………………………………… 13, 14

*SEC v. M & A West, Inc.,*
  538 F.3d 1043 (9th Cir. 2008) ……………………………………………………6

*SEC v. Phan,*
  500 F.3d 895 (9th Cir. 2007) ……………………………………………………7

*SEC v. Rana Research, Inc.,*
  8 F.3d 1358 (9th Cir. 1993) ………………………………………………………7

*SEC v. Rogers,*
  790 F.2d 1450 (9th Cir. 1986) ……………………………………………………7

*SEC v. Shanahan,*
  646 F.3d 536 (8th Cir. 2011) …………………………………………………… 19

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

iii

*SEC v. Chen*, 2:17-cv-00405-JLR

*SEC v. Stein.,*
   ___ F.3d ___, 2018 WL 4924358 (9th Cir., October 11, 2018) ............................7

*SEC v. W.J. Howey Co.,*
   328 U.S. 293, 301 (1946) ……………………………………………… 13

*SEC v. Zandford,*
   535 U.S. 813, 820-21 (2002) ……………………………………………… 12, 24

*Sundstrand Corp. v. Sun Chem. Corp.,*
   553 F.2d 1033 (7th Cir. 1977) ....................................................................7

*Svalberg v. S.E.C.,*
   876 F.2d 181, 184 (D.C. Cir. 1989) ……………………………………… 19

*Tolan v. Cotton,*
   572 U.S. 650 (2104)  ……………………………………………………… 6

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,*
   809 F.2d 626, 630 (9th Cir. 1987)  ……………………………………… 6

*United Housing Foundation, Inc. v. Forman,*
   421 U.S. 837, 852 (1975) ………………………….………………………… 13

*U.S. v. English,*
   92 F.3d 909 (9th Cir 1996) ………………………………………………19

*U.S.  v. Jinian,*
   725 F.3d 954, 968 (9th Cir. 2013) …………………………………… 14

*U.S. v. Ripinsky,*
   109 F.3d 1436, 1444 (9th Cir. 1997) …………………………………… 14

*U.S. v. Williams,*
   673 Fed.Appx. 620, 623 (9th Cir. 2016) ………………………………… 14

*U.S. v. Wright,*
   625 F.3d 583, 594–95 (9th Cir. 2010) ………………………………… 14

*Villiarimo v. Aloha Island Air, Inc.,*
   281 F.3d 1054, 1061 (9th Cir. 2002) ………………………………… 6

*Zetwick v. County of Yolo,*
   850 F.3d 436, 441 (9th Cir. 2017) ………………………………………... 6

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

iv

*SEC v. Chen*, 2:17-cv-00405-JLR

1
2      The Securities and Exchange Commission (the "SEC") respectfully moves this Court

3  for Summary Judgment on All Liability Issues against the Defendants, Andy Ching Fong

4  Chen ("Chen") and Aero Space Port International Group, Inc. ("ASPI") (collectively the

5  "Defendants").   If the Court grants this motion, there will be further proceedings necessary

6  to resolve remedies, whether on papers or in a hearing before the Court.

7

8                              **OVERVIEW OF THE CASE**

9

10     This civil enforcement action is before this Court on claims by the SEC that

11  Defendants fraudulently raised over $14.5 million from investors in exchange for securities

12  comprising membership interests in Washington Economic Development Capital III, LLC

13  ("EDC III").  The SEC alleges that Defendants falsely represented that all investor funds

14  would be used to finance a development in Moses Lake, Grant County, Washington, known

15  as ASPI Commerce Park.  On paper, if not in practice, that project would potentially meet

16  the criteria necessary for the investors to qualify for "Green Cards" through the United States

17
18  Citizenship and Immigration Service ("USCIS") EB-5 program.

19     But that is not what happened.  Instead of using the funds as represented to investors

20  and required by USCIS, Chen misappropriated the EDC III money and commingled it with

21  other Chen related funds.  He used the EDC III funds to engage in stock (and option) trading,

22  to satisfy margin calls in brokerage accounts, to pay salaries, benefits, and bonuses to his

23  family members, to make lease payments on a luxury automobile, and to make

24  undocumented "loans" to friends, relatives, and unrelated businesses that he supported and

25
26  controlled.  As a result, Chen and ASPI violated the U.S. securities laws, and compromised

27  the best chance these investors had of receiving a U.S. Green Card.

28

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                                   1                        *SEC v. Chen*, 2:17-cv-00405-JLR

**1.      Background on EDC III and the EB-5 Program**

EDC III is a Washington state LLC.  It was formed in May of 2011.  (*See* Declaration of John D. Worland, Jr., dated December 4, 2018 ("Worland Decl."), Exhibit 1, EDC III Washington state filings, original and most recent.)   Investors in EDC III purchased interests as "Members" of the LLC.

EDC III's purpose was to attract foreign money to invest in a project that would satisfy the requirements of the USCIS EB-5 program.  The "main elements" required were:

> •An investment of capital;
>
> •In a new commercial enterprise;
>
> •Which creates jobs.

(*See* Worland Decl., Exhibit 2, USCIS–Policy Manual, Volume Six, Chapter 2, "Eligibility Requirements" for Immigrant Investors.)   EDC III was to be the "new commercial enterprise" for the Commerce Park project.  Because the jobs were to be created in a rural "targeted employment area," the required capital investment was $500,000 per immigrant investor.   Each immigrant investment was required to create ten new jobs.  (*Id.*)

Tying these elements together was the "at-risk requirement":

> The **full** amount of capital must be used to undertake business activity that results in the creation of jobs.  …
>
> The **full** amount of the investment must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based.

(*Id.* at pages 6 and 7.)(Emphasis added.)

The process for an immigrant investor seeking to satisfy the EB-5 requirements had two basic steps.  The investor would first fill out what is called an I-526 petition.  (*See*

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                              2                    *SEC v. Chen*, 2:17-cv-00405-JLR

Worland Decl., Exhibit 3, USCIS–Policy Manual, Volume Six, Chapter 4, "Immigrant Petition by Alien Entrepreneur.")  This petition required an investor to submit the documents that established the size and *bona fides* of his investment (source of funds, etc.), the nature of the new commercial enterprise into which the petitioner was investing, which entity would create the new jobs, and how the jobs would be created.  (*Id.*)  For the new job requirement at the I-526 stage, it was acceptable to submit a business plan that showed how the jobs would be created within a two-year period beginning six months after the I-526 petition was approved.  (*Id.*)  If the I-526 petition was approved, the immigrant investor would get a temporary resident visa.

The next step was to seek permanent resident status through an I-829 petition.  (*See* Worland Decl., Exhibit 4, USCIS–Policy Manual, Volume Six, Chapter 5, "Removal of Conditions.")  This process required much of the same type of information.  The major difference was that the I-829 petition could not be filed until two years after the I-526 petition had been approved, so the best proof of job creation would have been W-2s and the like, or a business plan if the project were delayed.  Assuming everything went according to plan, the immigrant investor would get a visa for permanent residence in this country, and the "Green Card" that goes with it.

**2.      The Primary Misrepresentations and Omissions at Issue**

There are three documents that each investor in EDC III acknowledged receiving. These included the Subscription Agreement, Exhibit 5 to the Worland Decl.; the EDC III Limited Liability Company Agreement, Exhibit 6 to the Worland Decl.; and the Washington Economic Development Capital III Confidential Program Description Memorandum ("EDCIII Memo"), Exhibit 7 to the Worland Decl.  Together these three documents

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

3

*SEC v. Chen*, 2:17-cv-00405-JLR

constituted the "Offering Documents" for EDC III.

Each of these documents, in almost identical words, described how the investors' funds would be used.  The investments were to be pooled into EDC III, and held in FDIC insured accounts.  (*See* Worland Decl. Exhibit 5, page 2; Exhibit 6, page 1; Exhibit 7, page 10.)  The money was to be loaned to an ASPI subsidiary, North American Foreign Trade Zone Industries, LLC ("NAFTZI"), and the loan was to be secured by a first position Deed of Trust on the underlying real property at ASPI Commerce Park.  The loan was to earn 3.25% interest from NAFTZI to EDC III.  (*See* Worland Decl. Exhibit 5, page 3; Exhibit 6, page 3; Exhibit 7, page 11.)

The key misrepresentations related to how the investors' money would be used to satisfy the USCIS requirements for a Green Card.  To qualify for a Green Card, each investor had to show that his or her investment was ***"at risk" in a new commercial enterprise***, and that the project had created or would create ***at least ten jobs*** for each investor's $500,000 investment.  (*See* Worland Decl., Exhibit 2.)  In the Offering Documents, EDC III was described as a "newly created 'commercial enterprise.'"  (*See* Worland Decl. Exhibit 6, page 8.)  NAFTZI was described as the "developing entity of ASPI Commerce Park."  (Worland Decl. Exhibit 5, page 2.)  NAFTZI was also identified as the "Qualifying Employment Creating Entity" for the project.  (*See* Worland Decl. Exhibit 7, page 13.)

Thus, in theory, by loaning the money to NAFTZI, the EDC III investors would be putting their money *at risk on the project*, and NAFTZI's efforts at developing the project *would potentially create jobs*.  The path of the money – to NAFTZI, for development of ASPI Commerce Park – was absolutely crucial.  And each of the Offering Documents stated expressly that this was how the investors' money was going to be used:

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                        4          *SEC v. Chen*, 2:17-cv-00405-JLR

> The Funding to NAFTZI will be used to finance and develop the ASPI Commerce Park 4 Building and including, but not limited to, extend/upgrade industrial infrastructure to the site, and upgrade, refurbish, and refinance the existing ASPI Commerce Park 1, 2, and 3 buildings.  Other funds will be used to develop the remainder of the ASPI Commerce Park. This will involve additional infrastructure upgrades including sanitary sewer, municipal water, roads and traffic improvements, electric and telecommunications facilities and rail access.

(*See e.g.*, Worland Decl. Exhibit 5, page 3; Exhibit 6, page 3; Exhibit 7, page 11.)

Contrary to these representations, this is not what the Defendants did with the money. Indeed, the Defendants do not even claim that they did what they promised to do.  In their own motion for summary judgment, they admitted that they misused the funds because in their minds the restrictions on the use of the EDC III investor funds were not binding:

> ASPI, and its subsidiary NAFTZI, could use the loan proceeds in a matter it deemed appropriate under the circumstances.  So long as the borrower adheres to loan covenants and is not in default of its obligation, it has control over the use of loaned funds.

(ECF No. 25, Defendants' Motion at 7.)

> Further, the fully secured loan by EDC III to NAFTZI allowed NAFTZI/ASPI to utilize loaned funds for its business or other purposes.

(ECF No 25, Defendants' Motion at 16.)

In light of the plain language of the Offering Documents, and the clear requirements of the EB-5 program, these admissions fully support summary judgment for the SEC.

## LEGAL STANDARDS

**1.     Standard for Summary Judgment**

Summary judgement should be granted if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (*citing* Fed. R. Civ. P. 56(a)). The moving party must prove each element for which that party carries the burden of proof and the court must make all

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                                    5                    *SEC v. Chen*, 2:17-cv-00405-JLR

reasonable inferences in favor of the non-moving party. *S.E.C. v. Liberty Capital Group., Inc.*, 75 F. Supp. 2d 1160, 1163 (W.D. Wash. 1999) (*citing Anderson*, 477 U.S. at 255).

A fact is material if it is "relevant to an element of a claim or defense and [its] existence might affect the outcome of the suit." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *see Easley v. City of Riverside*, 890 F.3d 851, 859 (9th Cir. 2018) (*citing Anderson*, 477 U.S. at 248). Where the disputed fact is "irrelevant or unnecessary" to an element of a claim or defense, the dispute will not be counted for purposes of summary judgment. *Easley*, 890 F.3d at 859 (*quoting Anderson*, 477 U.S. at 248).

A genuine factual dispute exists where the non-moving party has presented "specific, significant probative evidence [disputing the fact], not simply 'some metaphysical doubt.'" *S.E.C. v. Abellan*, 674 F. Supp. 2d 1213, 1217 (W.D. Wash. 2009) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The court must not engage in weighing evidence; if there is conflicting evidence constituting a genuine issue of fact, the issue cannot be resolved on summary judgment. *Tolan v. Cotton*, 572 U.S. 650 (2014) (*citing Anderson*, 477 U.S. at 249). Thus, any determination of credibility is not appropriate at the summary judgment stage. *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017). Where there is some question as to whether a material fact has been genuinely disputed, the court must "resolve any uncertainty in favor of the non-moving party." *S.E.C. v. M & A W., Inc.*, 538 F.3d 1043, 1054 (9th Cir. 2008) (*citing Anderson*, 477 U.S. at 248). However, where the only conflicting evidence is "'uncorroborated and self-serving' testimony," the testimony does not create a contested fact. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (*quoting Kennedy v. Applause*, Inc., 90 F.3d 1477, 1481 (9th

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

6

*SEC v. Chen*, 2:17-cv-00405-JLR

Cir.1996).

**2.     Elements of the Securities Law Claims in the Complaint**

Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b–5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities.  These antifraud provisions forbid making a material misstatement or omission in connection with the offer or sale of a security by means of interstate commerce.  *See SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1364 (9th Cir. 1993); *SEC v. Rogers,* 790 F.2d 1450, 1458–59 (9th Cir. 1986).  …

Violations of Section 17(a)(1), Section 10(b) and Rule 10b–5 require *scienter. See Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). *Scienter* is satisfied by recklessness. *Hollinger v. Titan Capital Corp.,* 914 F.2d 1564, 1568–69 (9th Cir. 1990) (en banc).  Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an "extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977)).

Violations of Sections 17(a)(2) and (3) require a showing of negligence.  *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 453–54 (3d Cir. 1997).

*SEC  v. Dain Rauscher, Inc.*, 254 F.3d 852, 855–56 (9th Cir. 2001).  *Accord SEC v. Stein.*, ___ F.3d ___, 2018 WL 4924358 (9th Cir., October 11, 2018);  *SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007).

**THE UNDISPUTED FACTS PROVING
THE  ELEMENTS OF THE SEC'S LIABILITY CLAIMS**

The SEC will demonstrate below that, with respect to each element of its claims, the undisputed facts warrant granting summary judgment to the SEC.

**1.     The Defendants Made Misrepresentations or Omissions in Connection with the Sale of Securities in Interstate Commerce**

**a.     The Undisputed Facts with Respect to Misrepresentations and Omissions**

The primary misrepresentations in this case arise due to the following paragraph that was included in each of the Offering Documents:

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                                   7                         *SEC v. Chen*, 2:17-cv-00405-JLR

The Funding to NAFTZI will be used to finance and develop the ASPI Commerce Park 4 Building and including, but not limited to, extend/upgrade industrial infrastructure to the site, and upgrade, refurbish, and refinance the existing ASPI Commerce Park 1, 2, and 3 buildings.  Other funds will be used to develop the remainder of the ASPI Commerce Park. This will involve additional infrastructure upgrades including sanitary sewer, municipal water, roads and traffic improvements, electric and telecommunications facilities and rail access.

(*See e.g.*, Worland Decl. Exhibit 5, page 3; Exhibit 6, page 3; Exhibit 7, page 11.)

The SEC has established the falsity of these statements in two separate ways.  First, the SEC retained an independent forensic accountant to trace the use of the investors' money from the initial deposits through September 30, 2016, the approximate date that the building of ASPI Commerce Park 4 was completed.  The expert report confirmed that EDC III investor funds were not used as the Offering Documents stated they would be used.  (*See* Worland Decl., Exhibit 8, the Expert Report of Yasmine Misuraca, dated September 5, 2018, (the "Misuraca Report").)  The Misuraca Report summarized the timeline for the disbursement of the EDC III funds:

Based on the documents I have considered in this matter and the tracing of Investors' monies that I have performed, I have formed the following opinions:

• WAEDC III received $14,534,710 of investors' money into WAEDC III bank accounts, of which $13,000,000 represented Investors' capital and $1,534,710 represented fees. An additional $2,060,100 of investors' money was held in escrow, of which $2,000,000 represented Investors' capital and $60,100 represented fees.

• Approximately $14,534,419, of the $14,534,710, of investors' money had been disbursed as of July 31, 2015.

• As of July 31, 2015, there was approximately $7,759 remaining in WAEDC III bank accounts (excluded is the $1,000,100 of Investors' money held in escrow).

(*Id.* at 3.)  Only $7,566,535 of the EDC III investor money went to NAFTZI, the supposedly "job-creating" entity for the EDC III project, and it went to NAFTZI at least a full year

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

8

*SEC v. Chen*, 2:17-cv-00405-JLR

before any construction on the Commerce Park 4 building had been started. (*Id.* at 4.)

The expert then traced where the rest of the money went:[1]

There was approximately $6,499,180 received by Chen and Chen related persons and entities through the use of Investors' Funds. The total is comprised of $2,400 that Chen received as personal gift cards, plus $6,496,780 of Investors' Funds used for the following:

1.  $2,000,000 - Investors' Funds transferred to ML [another unrelated EB-5 project]

2.  $490,000- Investors' money sent to the TD Ameritrade account and never returned

3.  $166,538 - Fox Island Project [a non-EB-5 ASPI investment]

4.  $149,018 - Sun Basin [an orchard business related to Chen's father]

5.  $118,250 - WAEDC II [another unrelated EB-5 project]

6.  $500,000 - Timberland Bank [probably to repay an unrelated loan]

7.  $76,500 - Other Transfers

8.  $2,996,474 - ASPI expenses

- Payroll Related Expenses - $564,000

- Employee Benefits - $190,730

- Credit Card Payments - $253,806

- ASPI Board of Directors - $169,000

- Other Chen Family Members - $29,250

- BMW - $12,826

- Junping Sun - $540,000 [an investor in an unrelated EB-5 project]

1.   The expert had to use bank statements from third-party financial institutions and ASPI accounting records.  ASPI's records were often internally inconsistent and not in line with the bank statements, so the expert relied primarily on the bank statements.

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

9

*SEC v. Chen*, 2:17-cv-00405-JLR

- Other Transfers - $269,988

- G and L International and Rongying Wu - $966,874 [?]

(*Id.* at 38-39.)

The Defendants have not offered any expert report to refute the SEC's expert.  Thus, there is no genuine dispute about how the Defendants used the investors' money.  *See e.g. Farrakhan v. Gregoire*, 590 F.3d 989, 1002 (9th Cir.), on reh'g en banc, 623 F.3d 990 (9th Cir. 2010)(granting summary judgment and noting that the failure to provide a counter-expert report prevents even the suggestion "that there is some dispute about the ultimate conclusions of Plaintiffs' experts' reports.") .  *Accord Garber v. US*, 709 F.App'x 485 (9th Cir. 2018)(summary judgment granted "because [plaintiff] failed to adduce expert testimony and therefore failed to establish a genuine dispute of material fact as to the elements of his medical malpractice claim"); *SEC v. Cooper*, 142 F. Supp. 3d 302, 316 (D.N.J. 2015) ("unchallenged expert report and all the evidence indicates that the transactions were fake, and Defendants have offered no evidence to the contrary" granting summary judgment.)

The SEC has also established its misrepresentation and omission claims by admissions from the Defendants themselves.  As shown above, in their own motion for summary judgment, Defendants acknowledge that they treated the investor funds as if they were simply a line of credit.  (*See supra* at 5.)   Independent of their submissions in this action, Defendant Chen has submitted a personal letter to the Director of USCIS, in response to USCIS's Notice of Intent to Terminate ASPI as a Regional Center.  (*See* Worland Decl., Exhibit 9.)   In this letter, Chen admitted:

> Once the loan was in place and secured by the designated real property, ASPI viewed the funds as 'working capital' and commingled the loan funds with funding from other ASPI sources to complete the project. This is acceptable with most government

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

10

*SEC v. Chen*, 2:17-cv-00405-JLR

> loans including the SBA and New Market Tax Credit program. This is the 'diversion' of funds that the SEC action refers to - and the USCIS adjudicator refers to. Loan funds and funds from ASPI income sources were used to pay ASPI overhead, employee wages and benefits, and other company expenses.

(*See* Worland Decl., Exhibit 10, at page 7-8.)  The admission that the funds were "commingled" for use in purposes unrelated to EDC III is, by itself, a violation of the USCIS "at-risk" requirement that the **full amount** of the funds be dedicated to the job-creating project.  (*See supra*, at 2.)  But as the independent forensic accountant report confirms, EDC III investor funds were also used for completely non-commercial purposes, – stock and option trading, a luxury car, and other entirely personal matters for Defendant Chen – all in contravention of Defendants' representations to investors.  (*See* Worland Decl., Exhibit 8, at 38-39.)

Moreover, even if it were somehow appropriate to use the EDC III investor funds as general "working capital" for ASPI, the failure to disclose that intent would constitute an actionable omission under the securities laws.  Section 17(a)(2) of the Securities Act states that it is unlawful:

> to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

15 U.S. Code § 77q(a)(2).  The SEC's Section 10 claims under the Exchange Act, as implemented by SEC Rule 10b-5, is to the same effect:

> Commission Rule 10b–5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 CFR § 240.10b–5 (2004).

*Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341, (2005).

1
2      This case, of course, relies primarily on direct misrepresentations.  But to the extent
3 the Defendants try to excuse their misrepresentations by offering a unique interpretation of
4 their own words, they are still liable for material omissions concerning their representations.
5
6      **b.      The Undisputed Facts Show that the Misrepresentations Were in
                 Connection with the Offer or Sale of Securities in Interstate Commerce**
7
8      The "in connection with" and "offer or sale" requirements are also satisfied here:
9          a "misrepresentation or omission of a material fact" is made "in connection with
           the purchase or sale" of a security when the "fraud coincided with the sales [or
10         purchases] themselves." *Zandford,* 535 U.S., at 820, 122 S.Ct. 1899; see also
           *Dabit, supra,* at 85, 126 S.Ct. 1503.
11
12 *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 404 (2014).  The "in connection with"
13 element is met here because Defendants' misrepresentations coincided with the Defendants'
14 sales of membership interests in EDC III.
15      Each investor in EDC III acknowledged receiving the Offering Documents for
16 review.  Following that review, the investor tendered his or her $500,000, plus between
17 $30,000 and $60,000 in additional fees.  (*See* Worland Decl. Exhibit 5, at 1.)  Thus, there can
18 be no doubt that the EDC III investors received and reviewed the statements quoted above
19
20 coincident with making their investments.
21      There is also no possible dispute that the EDC III investment interests were
22 securities.  The Ninth Circuit has recently decided this question with respect to an EB-5 case
23 that involves an investment structure that is **identical to EDC III**.
24         The Appellants' project involved selling membership interests in an LLC, which
           would then lend the proceeds of those sales to a second LLC; the second LLC was
25         supposed to use the lent funds to construct and operate a cancer treatment center
           in California. Each investor was required to put up a $500,000 "Capital
26         Contribution" and a $45,000 "Administrative Fee."
27                                      *      *      *
28

Securities and Exchange Commission's                    12                    *SEC v. Chen*, 2:17-cv-00405-JLR
Memorandum in Support of its Motion for
Summary Judgment

> The POM [offering document] provided that if the cancer center project succeeded, after five years the second LLC would repay its loan with interest "at the rate of 0.25% per annum," and these funds would be distributed to investors. This promise is enough to establish that investors had some expectation of receiving profits, as required under *Forman.*

*SEC v. Liu*, No. 17-55849, 2018 WL 5308171, at *1, *2 (9th Cir. Oct. 25, 2018), *citing United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975) (*quoting SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946).[2]

The SEC also has indisputable evidence satisfying the interstate commerce requirement.  The Misuraca Report traced the money both coming into and out of the ASPI/EDC III bank account at East West Bank in Seattle.[3]  The report contains a spreadsheet showing the money coming into that account, and the originating source of those deposits. (*See* Worland Decl., Exhibit 11,{Exhibit 2 to the Misuraca Report}.)   That spreadsheet shows that essentially all of the EDC III investor deposits came into the ASPI/EDC III bank account through wire transfers.  This meets the legal requirement for the use of an instrumentality of interstate commerce:

> the use of the wire system is by its very nature interstate, because "[w]ires are

2.    The Ninth Circuit has previously decided that even if the primary reason for an investment were not profits, an investment contract could still be a security.  *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 464 (9th Cir. 1985)(investment primarily for tax benefits),  *citing SEC v. Aqua-Sonic Products Corp.,* 687 F.2d 577 (2d Cir.), *cert. denied,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982) (expectation of profit even though investment was promoted largely for its tax benefits).

3.    East West Bancorp, Inc. is the holding company for East West Bank with total assets of $39.1 billion as of September 30, 2018. East West Bank is headquartered in Pasadena, California and has over 130 locations in the U.S. and Greater China. In the U.S., East West has branches in California, Georgia, Massachusetts, Nevada, New York, Texas and Washington.  In Greater China, East West's presence includes full service branches in Hong Kong, Shanghai, Shantou and Shenzhen, and representative offices in Beijing, Chongqing, Guangzhou, Taipei and Xiamen. *Source*:  East West Bancorp, Inc. webpage.

channels or instrumentalities of interstate commerce" *See United States v. Jinian*, 725 F.3d 954, 968 (9th Cir. 2013); *United States v. Ripinsky*, 109 F.3d 1436, 1444 (9th Cir. 1997) (construing 18 U.S.C. § 1957); *United States v. Wright*, 625 F.3d 583, 594–95 (9th Cir. 2010) ("the very interstate nature of the internet favor[s] finding that the [transmissions] traveled in interstate commerce," at least where no evidence is presented that transactions were purely intrastate) (citation and internal quotation marks omitted). Moreover, there is "no dispute that the deposits in this case involved financial institutions engaged in interstate activities," and indeed, several of the banks involved were "large, well-known institutions" headquartered outside of [Washington] … . *See Ripinsky*, 109 F.3d at 1445.

*U.S. v. Williams*, 673 Fed.Appx. 620, 623 (9th Cir. 2016).

## 2.    It Is Indisputable that the Misrepresentations and Omissions Were Material

As previously shown, the Ninth Circuit decision in *SEC v. Liu*, No. 17-55849, 2018 WL 5308171 (9th Cir. Oct. 25, 2018) dealt with a securities offering that was structurally identical to EDC III.  (*See supra*, at 12-13.)   The District Court decision in that case dealt with the materiality issue in the EB-5 context.  The promoters in *Liu* had promised the investors that their money would be used to pursue a jobs-creating project, but then used the money for other purposes.  The Court held that such behavior was:

> fundamentally inconsistent with the EB–5 program and would drastically undermine the project's viability and therefore threaten investors' ability to obtain visas. … Therefore, there is no genuine dispute that any reasonable EB–5 investor would deem the omissions and misrepresentations in the POM [offering memorandum] material.

*SEC v. Liu*, 262 F. Supp. 3d 957, 971–72 (C.D. Cal. 2017), *aff'd*, No. 17-55849, 2018 WL 5308171 (9th Cir. Oct. 25, 2018).

Just as in *Liu*, and for the same reason, this case merits summary judgment on the element of materiality as a matter of law.  In their own motion for summary judgment, Defendants offered ten Declarations from investors in EDC III.  (*See* ECF No. 27-1.)  The Declarations present explicit, irrefutable, evidence that getting a Green Card was absolutely material to the EDC III investors.  Each and every one of the "Declarations" submitted for

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

14

*SEC v. Chen*, 2:17-cv-00405-JLR

that motion (*Id.*, Exhibits 1-10) includes the following two paragraphs:

> 2.   I invested in ASPI's WA EDC III in [year]. **The sole purpose of the investment was to get green cards for my family** [family members].
>
> \*          \*          \*
>
> 7.   … I am fully satisfied with Andy Chen's management of my investment **and his efforts to help my family get green cards**, which is my primary investment objective.

(*Id.*, paragraphs 2, 7.) (Emphasis added.)

The EDC III investors clearly believed that investing in EDC III would help them achieve their goal of a Green Card.  They were wrong, and they were wrong because the Offering Documents misrepresented how the investors' funds were going to be used.  Had the Defendants adhered to the Offering Documents, the EDC III investors might have had a chance at a Green Card.  Now, they almost certainly do not. That makes the misstatements and omissions material as a matter of law, just as the Court in *SEC v. Liu, supra,* held.

There is a direct and irrefutable connection between the misrepresentations and omissions in this case and the EDC III investors' prospects for a Green Card.  On June 20, 2018, USCIS issued a Notice of Intent to Terminate ASPI as a USCIS approved regional Center, USCIS asserted:

> As explained, above, all of the [EDC III] sponsored by the Regional Center have engaged in business practices and financial mismanagement that have undermined the ability of EB-5 investors to attain the benefits they have sought. In each case, the Regional Center or its principal, Andy Chen, acting as general partner of the [EDC III] or [NAFTZI] or both, has **diverted EB-5 investors' capital away from the intended projects described in [EDC III's] associated business plans, has organized loans and financial transactions that do not meet the requirements of the EB-5 Program in terms of making funds available for the purposes of job creation, and never providing accurate, complete, and verifiable information that would allow USCIS to conclude that any job creation has taken place.**

(Worland Decl., Exhibit 9, at 17.) (Emphasis added.)

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

15

*SEC v. Chen*, 2:17-cv-00405-JLR

In addition, during 2018, the USCIS Administrative Appeals Office issued six decisions affirming the denial of I-526 petitions for EDC III investors.  These decisions involve "de novo" review of the denials by the original adjudicating officer.  Although each of these opinions is designated a "Non-Precedent Decision," their extraordinary implications are hard to deny.  (Worland Decl., Exhibit 12, redactions in originals.)

In relevant part, the opinions of the Appeals Office all cite the same failures of the Defendants to honor their promises to the EDC III investors that are the focus of the SEC misrepresentation claims in the Complaint:

> [T]he foreign national investor must demonstrate that "(t)he full amount of [his or her] funds [are] made available to the business(es) most closely responsible for creating the employment upon which the petition is based." *Id.* at 179; *see also* USCJS Policy Memorandum PM-602-0083, *supra,* at 16, 25. In summary, the investor must demonstrate that his or her investment, in its entirety, is made available to the JCE.  Here, the Petitioner has not made such a showing.

(*Id.*, at 4.)

The opinions also note the failure to show that there were sufficient jobs created, or even possible, for the EDC III investors.  Importantly, by January 26, 2018, the date of the first Appeals Office opinion, construction of Commerce Park 4 had been complete for close to fifteen months.  Yet what should have been immediately available proof of job creation was still unavailable:

> While the Petitioner maintains on appeal that [NAFTZI] has created the required number of jobs for all of [EDC III's] investors seeking immigrant investor classification, she has not offered "photocopies of relevant tax records, Form I-9, or other, similar documents" to substantiate the alleged employment creation. 8 C.F.R. § 204.6G)(4)(i)(A). As such, we will examine the business plan to determine if it is comprehensive and credibly shows that [NAFTZI]will need not fewer than 10 full- time qualifying employees for each immigrant investor due to its nature and projected size.

(*Id.*, at 6.)   Relying on a business plan for a project that had already been operating at

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

16

*SEC v. Chen*, 2:17-cv-00405-JLR

full capacity for well over a year would appear to offer the Petitioner a considerable

accommodation.  Nonetheless, the Appeals Office found the business plan inadequate to

prove job creation. "The Petitioner has not sufficiently demonstrated that the business plan

is credible."  (*Id.*)  Given that the same business plan is used by all EDC III petitioners, it

seems unlikely that any other petitioner from the EDC III investor pool would do any better.

Later in each opinion, the Appeals Office notes that it was presented with **<u>seven</u>**

different "estimates" of what it had cost to build Commerce Park 4, the lowest of which was

$7,760,196.  (The actual construction cost, as presented in Exhibit 13 to the Worland Decl.,

was $4,552,378.48.)  But the Appeals Office got to the core of the issue:

> [T]he proposed loan amount is more than the alleged construction costs.   The
> record does not specify how the [NAFTZI] would use the excess funds on a
> property that the Petitioner claims it has leased to another business.  Without
> additional explanation and corroboration on the [NAFTZI] needs for a loan from
> [EDC III], the Petitioner has not established that the business plan, as well as the
> multiple versions of the economic analysis, credibly demonstrates that her and
> other investors' funds will create the requisite number of jobs for qualifying
> employees.

(Worland Decl., Exhibit 12, at 7.)

This finding is unassailable.  The Defendants point to the fact that the construction

of Commerce Park 4 has been completed.  They apparently claim that this satisfies their

obligation to the investors in EDC III.  It is true that a building called Commerce Park 4

now exists.  But the Defendants did not spend $14.5 million on that building.  They spent

$4,552,378.48 for the construction of the building, and presumably a considerably lesser

amount on related infrastructure improvements for the Commerce Park site as a whole.

(Worland Decl., Exhibit 13.)  This case involves original investments of over $14.5 million.

There is no way, as a matter of arithmetic, that the original EDC III investors could all have

qualified for a Green Card, since less than half of the money was spent on the job-creating

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

17

*SEC v. Chen*, 2:17-cv-00405-JLR

project.  And the Defendants are now on record repeating the claim that:

> The construction project described in the EDC III governing documents
> is fully completed exactly as promised.

(*See* ECF No. 25, at 6.)  Accordingly, the Defendants admit that they embarked on a project that could not have met the standards of EB-5 for at least half of their original investors.

**3.     It Is Indisputable that the Defendants Acted with the Required Mental State**

   **a.     The Scienter Standard**

Scienter under Section 10(b) of the Exchange Act and Section 17(a)(1) is "the mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976).  Intent to deceive, manipulate, or defraud includes both knowingly making false statements and making false statements with reckless disregard for their truth.  *Schueneman v. Arena Pharmaceuticals*, 840 F.3d 698, 705 (9th Cir. 2016).  *See also Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc) (holding that recklessness as to the truth of a statement satisfies the scienter requirement). Deliberate recklessness is "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger*, 914 F.2d at 1569. Thus, scienter is established when a defendant "makes false or misleading statements 'either intentionally or with deliberate recklessness.'" *El Dabe v. Calavo Growers, Inc.*, 719 F.App'x 607, 608 (9th Cir. 2018) (*quoting In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

Scienter does not require the Defendants to know that their acts or omissions are illegal.  *S.E.C. v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980).  Courts have

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

18

*SEC v. Chen*, 2:17-cv-00405-JLR

universally rejected the argument that scienter under 10(b) requires intent to act in violation

of the law. *Svalberg v. S.E.C.*, 876 F.2d 181, 184 (D.C. Cir. 1989) ("[S]cienter does not

mean that the subject believed his action to be illegal.") (cited in reference to scienter in

*S.E.C. v. First Pac. Bancorp*, 142 F.3d 1186, 1191 (9th Cir. 1998)), *Pittsburgh Terminal*

*Corp. v. Baltimore & Ohio R. Co.*, 680 F.2d 933, 942 (3d Cir. 1982) ("A violation of Section

10(b) does not require a specific intention to break the law."), *Falstaff Brewing Corp.*, 629

F.2d at 77 ("Knowledge [under 10(b)] means awareness of the underlying facts, not the

labels that the law places on those facts."), *Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171, 181

(2d Cir. 1976) ("[T]here must be proof of intention 'to deceive, manipulate, or defraud' not

an intention to do this in knowing violation of the law.") (applying equally to 10(b) scienter

and criminal fraud scienter, and cited in reference to criminal scienter in *U.S. v. English*, 92

F.3d 909, 915 n.8 (9th Cir. 1996)). Thus, scienter in the context of Section 10(b) does not

require any knowledge of the law nor intention to break the law.

### b.     The Negligence Standard

The negligence standard under Sections 17(a)(2) and (a)(3) of the Securities Act is

also applicable to this case because the Defendants both obtained money from the EDC III

investors by means of their misrepresentations and omissions, and operated a fraud upon

those investors.  The standard of negligence used is often described as the "reasonable

person" standard.

> the definition of negligence is "the failure to use reasonable care, which is the
> degree of care that a reasonably careful person would use under like
> circumstances." Instructions of Law to the Jury at 13, *SEC v. Stoker,* No. 11–cv–
> 7388 (JSR) (S.D.N.Y. July 31, 2012), ECF No. 89 [hereinafter *"Stoker*
> Instructions"]; *see also SEC v. Shanahan,* 646 F.3d 536, 545 (8th Cir.2011)
> (defining negligence, in the context of Section 17(a)(2) and (a)(3) claims, as "the
> degree of care that an ordinarily careful person would use under the same or
> similar circumstances"). Such negligence "may consist either of *doing* something

Securities and Exchange Commission's                    19                    *SEC v. Chen*, 2:17-cv-00405-JLR
Memorandum in Support of its Motion for
Summary Judgment

that a reasonably careful person *would not do* under like circumstances, or in *failing* to do something that a reasonably careful person *would do* under like circumstances." *Stoker* Instructions at 13 (emphases in original).

*S.E.C. v. Cole*, No. 12-CV-8167 RJS, 2015 WL 5737275, at *6 (S.D.N.Y. Sept. 19, 2015). The Ninth Circuit has also addressed the issue of what is the appropriate negligence standard under the securities laws, and has concluded that "the controlling standard remains one of reasonable prudence."  *S.E.C. v. Dain Rauscher, Inc.*, 254 F.3d 852, 857 (9th Cir. 2001). *Accord, SEC v. Blockvest, LLC*, 2018 WL 4955837 (S.D.Ca.)(October 5, 2018).

### c.   The Undisputed Facts Show that the Defendants Intended this Fraud from the Outset

Defendant Chen is an experienced business man.  He has two degrees from the University of Washington, one in economics, the other in accounting.  (*See* Worland Decl., Exhibit 14.)  He has held a license as a Certified Public Accountant in the state of Washington.  (*Id.*)  He claims that ASPI and its related companies operating in Grant County are worth $150 million. (*Id.*)

He also knows that it is not uncommon for a loan to have restrictions on the use of the loan proceeds. (*Id.*)   Yet he persists in asserting that an EB-5 loan pool has no restrictions.  This is obviously wrong.  The use of EB-5 money, whether in an "equity model" or a "loan model," is always restricted by the legal requirements governing USCIS.

But it was Chen's intent to deviate from these requirements, and the statements made in the Offering Documents, from the beginning.   Attached as Exhibit 15 to the Worland Declaration is an undated document called "Memorandum of Minutes" of ASPI Group Inc. (*See* Worland Decl., Exhibit 15.) Defendant Chen testified about this document during the SEC's investigation.  (*See* Worland Decl., Exhibit 16, selections from the Investigative Testimony of Andy Chen.)  Defendant Chen testified that the document dated

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                                         20                      *SEC v. Chen*, 2:17-cv-00405-JLR

from 2009 or 2010, **before** anyone had invested in EDC III.  (*Id.*, at 150-153.)

Defendant Chen was asked about several specific passages in the "Minutes."  These included the following:

> Provided that the loan is not in default and the security for the note is in effect, the use of the promissory note funds is, basically, unrestricted. Given the environment that ASPI is a very small company, this  provides ASPI with the accounting flexibility to combine vendor accounts, payables, receivables, and payroll expenses into single accounts. Of course, internal accounting would still be maintained to track funding from each regional center investor pool, but would allow ASPI complete discretion during the five year loan period to allocate borrowed funds as it saw fit and to make decisions on how revenues (leasing income) and related expenses are allocated.
>
> *         *         *
>
> Note that it would also allow flexibility to the ASPI/ASPI-related development entity to place excess funds in temporary/short term uses or to move funds between projects as may be deemed necessary to accommodate short term cash flow management. It also allows ASPI/ASPI-related developer to commingle the borrowed funds with rental income, at its discretion, without having to maintain separate accounts.

(*See* Worland Decl., Exhibit 15, at 6.)

This is exactly what happened with the money invested into EDC III.  It was used as if the funds belonged to ASPI, to be used as ASPI saw fit.  But none of this was in the Offering Documents and, more importantly, this self-serving plan was never disclosed to USCIS, or discussed with anyone knowledgeable about the EB-5 program.  Defendant Chen admitted this under oath:

> **Q Is that, based on your experience, consistent with the rules that govern the EB-5 program?**
>
> A If you look up an EB-5 program, you know, when I --
>
> **Q I'm sorry. It is? It is consistent with your understanding?**
>
> A For a loan model, we --

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                    21                    *SEC v. Chen*, 2:17-cv-00405-JLR

1

2          **Q Okay. Is it yes?**

3           A Yes.

4          **Q Okay. Did you consult with anyone other than yourself to confirm that
            your understanding was correct?**
5

6           A Consult with anyone?

7          **Q Yes. Did you seek advice from anyone to confirm that your understanding
            of the paragraph that I just read was consistent with your EB-5 program?**
8

9           A No.

10         **Q Okay. Did you seek the advice of any attorneys -- sorry, let me finish the
            question -- to confirm whether what is expressed in the paragraph I just read
            was consistent with the EB-5 program?**
11

12          A No, but –

13     (*See* Worland Decl., Exhibit 16, at 164-65.)

14
           **Q Did you ever submit Exhibit 4 to USCIS for its consideration?**
15

16          A Exhibit 4?

17
           **Q This document that's marked as Exhibit 4. Did you ever submit a copy of
            Exhibit 4 to USCIS for its consideration?**
18

19          A No, we have this. This is our internal board meeting. You know, we are --

20
           **Q Okay.**
21

22          A One thing –

23         **Q Mr. Chen, look, we appreciate your view given the testimony, but we have
            a lot to cover today. So you've answered that question. I just want to kind of
24          focus on the question, okay.**

25          A Uh-huh.

26
           **Q For the portion of Exhibit 4 that Mr. Johnson just read into the record, did
27          you seek anyone's advice to see if it conformed with the EB-5 regulations?**

28

Securities and Exchange Commission's                22        *SEC v. Chen*, 2:17-cv-00405-JLR
Memorandum in Support of its Motion for
Summary Judgment

A No. We don't have this. This is our internal memo about board members and myself.

**Q Okay. Did you seek the advice of any attorneys to determine whether the portion of Exhibit 4 that Mr. Johnson just read into the record conformed with the EB-5 regulations?**

A No.

(*See* Worland Decl., Exhibit 16, at 170-71.)[4]

So, the intent of the Defendants was clear from the beginning.  They intended to use EB-5 investment projects to raise money for their discretionary use.  They never told investors that in the Offering Documents.  They gave the Offering Documents both to the investors and to USCIS as part of the I-526 Petitions of the EDC III investors.  (*See* Worland Decl., Exhibit 17, an example of an I-526 Petition for an EDC III investor; note that the investor lists ASPI's corporate office as his address.)

But Defendants did not tell USCIS about the plan to use the money for non-EB-5 purposes.  And Defendants did not tell the investors what would happen to their Green Card hopes once USCIS found out.  And Defendants never consulted with anyone to find out if this was in any way inappropriate.  This is reckless, if not intentional, conduct as a matter of law.

It thus makes no difference whether the standard of intent is *scienter*, including recklessness, or whether it is mere negligence because Defendants satisfied the higher

---

4.  In another part of the "Minutes" it is stated that:

> Said funds would also be used for the typical and customary operating expenses of ASPI and ASPI-related entities including, but not limited to, the payment of employee compensation and office expenses.

(*See* Worland Decl., Exhibit 15, at 11.)

standard.  The Defendants said one thing with the clear intention of doing something else –

with other people's money.  This is a clear violation of the anti-fraud provisions of the

federal securities laws.

### 4.    The Defendants' Conduct Also Constituted an Illegal Scheme to Defraud

The Defendants also engaged in a fraudulent scheme under Rule 10b-5(a) and (c) and

Sections 17(a)(1) and (3).  Misappropriation of investment funds constitutes fraudulent

conduct for purposes of Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3).  *See SEC v.*

*Fraser*, 2009 WL 2450508, at *9 (D. Ariz. Aug. 11, 2009) (stating that "scheme liability"

derives from "the first and third prongs" in both Section 17(a) and Rule 10b-5).  Defendants

controlled investor capital contributions, misappropriated those funds, and commingled

capital contributions in multiple accounts.  *Cf. SEC v. Zandford*, 535 U.S. 813, 820-21

(2002) (reasoning that a stockbroker with discretionary authority over his customer's account

engaged in an actionable "course of conduct" and scheme to defraud under Rule 10b-5 when

he secretly sold off securities in the account and misappropriated the proceeds).

## <u>CONCLUSION</u>

The SEC has demonstrated each element of each charged offense with undisputed

facts.  Summary judgment is appropriate.

Dated:  December 4, 2018

Respectfully submitted,

By:

<u>s/ *John D. Worland, Jr.*</u>
John D. Worland, Jr.
Gregory N. Miller
(Conditionally Admitted
Pursuant to Local Rule 83.1)
David Mendel
Assistant Chief Litigation Counsel
Securities and Exchange Commission
100 F Street NE

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

24

*SEC v. Chen*, 2:17-cv-00405-JLR

Washington, DC 20549
(202) 551-4438
worlandj@sec.gov

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment

25

*SEC v. Chen*, 2:17-cv-00405-JLR

## CERTIFICATE OF SERVICE

I certify that on December 4, 2018, a copy of the foregoing document was served

upon counsel of record via the Court's electronic filing system, which sends notification

to:

Frank R. Siderius, Esq.
SIDERIUS, LONERGAN & MARTIN
Attorney for Defendants and Relief Defendants
500 Union Street, Suite 847
Seattle, WA 98101
206.624.2800 work
franks@sidlon.com


s/ *John D. Worland, Jr.*
John D. Worland, Jr.

Securities and Exchange Commission's
Memorandum in Support of its Motion for
Summary Judgment                                      26                          *SEC v. Chen*, 2:17-cv-00405-JLR