UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. C17-0405JLR |
| Plaintiff, | ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| ANDY SHIN FONG CHEN, et al., | |
| Defendants, and | |
| NORTH AMERICAN FOREIGN TRADE ZONE INDUSTRIES, LLC, et al., | |
| Relief Defendants. | |

## I.    INTRODUCTION

Before the court are:  (1) Defendants Andy Shin Fong Chen ("Mr. Chen") and

Aero Space Port International Group, Inc.'s ("ASPI") (collectively, "Defendants") and

North American Foreign Trade Zone Industries, LLC ("NAFTZI"), Washington

Economic Development Capital, LLC ("EDC I"), Washington Economic Development Capital II, LLC ("EDC II"), EVF, Inc. ("EVF"), Moses Lake 96000 Building, LLC ("Moses Lake 96000"), Sun Basin Orchards, LLC ("Sun Basin Orchards"), PIA, LLC ("PIA"), John Chen, Tom Chen, Bobby Chen, and Heidi Chen's (collectively, "Relief Defendants") motion for summary judgment (Def. MSJ (Dkt. # 25)); and (2) Plaintiff Securities and Exchange Commission's ("SEC") motion for summary judgment (Pl. MSJ (Dkt. # 36)). The SEC opposes Defendants and Relief Defendants' motion for summary judgment. (Pl. Resp. (Dkt. # 31).) Defendants and Relief Defendants oppose the SEC's motion for summary judgment. (Def. Resp. (Dkt. # 39).) The parties filed replies. (Def. Reply (Dkt. # 32); Pl. Reply (Dkt. # 44).) The court has considered the motions, the parties' submissions concerning the motions, the relevant portions of the record, and the applicable law. Being fully advised,[1] the court GRANTS in part and DENIES in part the SEC's motion for summary judgment. The court further GRANTS in part and DENIES in part Defendants' motion for summary judgment.

## II.    BACKGROUND

This case is a securities enforcement action. It arises out of Defendants' alleged misuse of the EB-5 Immigrant Investor Program ("EB-5"), which affords certain foreign investors a path to permanent residency in the United States. (*See generally* Compl. (Dkt. # 1).) The SEC alleges that Defendants violated securities laws by making material

---

[1] No party requests oral argument on the motions (*see generally* Def. MSJ; Pl. Resp.; Pl. MSJ; Def. Resp.), and the court has determined that oral argument would not be of assistance in deciding the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

misrepresentations to foreign investors who purchased membership interests in an EB-5 project based in Moses Lake, Washington. (*See, e.g.*, *id.* ¶¶ 26-35, 71-72.) According to the SEC, Defendants misappropriated millions of dollars in investor funds for uses unrelated to the EB-5 venture to which investors committed their capital. (*See, e.g.*, *id.* ¶¶ 37-70.) Defendants deny that they materially misrepresented aspects of their EB-5 project to foreign investors. (*See generally* Answer (Dkt. # 17); Def. MSJ.) The court outlines the EB-5 program before detailing the factual background to the SEC's claims.

**A.     The EB-5 Program**

Administered by United States Citizenship and Immigration Services ("USCIS"), the EB-5 program allows certain foreign investors to obtain visas and, eventually, lawful permanent resident status. *See* 8 U.S.C. § 1153(b)(5); (*see generally* Worland Resp. Decl. (Dkt. # 30) ¶ 3, Ex. 2 ("USCIS Policy Manual, Ch. 2").) Eligible immigrant investors must show that: (1) they have invested or are in the process of investing a specified amount of capital in a new commercial enterprise; and (2) their investment will create at least 10 jobs for United States workers. 8 U.S.C. § 1153(b)(5)(A); (*see also* USCIS Policy Manual, Ch. 2 at 1 (noting that the EB-5 program requires "an investment of capital . . . in a new commercial enterprise . . . which creates jobs").) Where the new commercial enterprise is based in a "targeted employment area," immigrant investors must invest a minimum of $500,000.00. *See* 8 U.S.C. § 1153(b)(5)(C); (*see also* USCIS Policy Manual, Ch. 2 at 9.)

In the early 1990s, lawmakers amended EB-5 program requirements to permit foreign investors to pool their capital in "regional centers," USCIS-approved entities

committed to supporting economic growth in particular regions.  *See* 8 C.F.R. § 204.6(e);

*see also id.* § 204.6(m)(1) (citing Section 610 of the Departments of Commerce, Justice,

and State, the Judiciary, and Related Agencies Appropriation Act of 1993, Pub. L.

102-395, 106 Stat. 1828).  Regional centers collaborate with new commercial enterprises,

which in turn may affiliate with one or more "job-creating" entities to carry out specific

investment projects.  (*See* USCIS Policy Manual, Ch. 2 at 7.)

In the regional center context, immigrant investors may qualify for EB-5 status

and permanent residency if their investments "indirectly" create at least 10 jobs.  (*See id.*

at 10.)  A foreign investor cannot qualify for EB-5 status merely by showing that the

investor remitted funds to a new commercial enterprise that pledged to loan those funds

to a job-creating entity, however.  (*Id.* at 7.)  Rather, the investor must show that the new

commercial enterprise made "the full amount" of his or her investment "available" to the

entity or entities responsible for the job creation upon which the investor's immigration

petition is based.  (*Id.*); *see also In re Izummi*, 22 I. & N. Dec. 169, 179 (B.I.A. 1998).

An EB-5 investor's path to permanent residency has two steps.  First, the investor

files a petition for EB-5 status ("the I-526 petition"), which requires that the investor

show it is more likely than not that his or her investment will satisfy the job-creation

requirements.  (*See* Worland Resp. Decl. ¶ 4, Ex. 3 at 1-2.)  If the I-526 petition is

approved, the investor may go on to acquire conditional permanent resident status.  (*Id.*)

Second, approximately two years after USCIS approves the I-526 petition, the investor

files a petition to remove the conditions on his or her permanent resident status ("the

I-829 petition").  (Worland Resp. Decl. ¶ 5, Ex. 4 ("USCIS Policy Manual, Ch. 5") at 2);

*see also* 8 U.S.C. § 1186b(c)(1). For the I-829 petition to succeed, the investor must demonstrate that he or she invested the requisite capital and that the investment created, or will create within a reasonable period, at least 10 qualifying jobs. (USCIS Policy Manual, Ch. 5 at 2-3.)

**B.     Factual Background**

1.     ASPI, NAFTZI, and EDC III

ASPI, a Washington State corporation, was designated a regional center in 1994. (Def. MSJ at 4; Compl. ¶ 11.) Since then, ASPI has managed several EB-5 projects in rural Grant County, Washington. (Chen Decl. (Dkt. # 26) ¶¶ 6, 11.) In addition, ASPI engages in business activities related to the Chen family's substantial real estate holdings. (Compl. ¶ 11; *see also* Chen Decl. ¶ 19.) ASPI's shareholders include Mr. Chen, John Chen, Tom Chen, and Bobby Chen. (Chen Decl. ¶ 11.) Mr. Chen, John Chen's son and ASPI's president, manages ASPI's day-to-day operations, including its EB-5 initiatives. (*Id.*; Compl. ¶ 11.)

In 2009, USCIS recertified ASPI as a regional center under the EB-5 program. (Chen Decl. ¶ 24, Ex. 1 at 1.) In a letter to Mr. Chen, USCIS confirmed that, for purposes of its role as a regional center, ASPI's "geographic area" encompassed all of Grant County, Washington. (*Id.*) Additionally, USCIS stated that, as a regional center, ASPI could "either direct investments into single projects or form an investment fund to fund multiple projects." (*Id.*) Defendants state that the recertification letter granted ASPI authority to operate pursuant to a "pooled loan model" in which immigrant investors would "act as secured commercial lender[s]." (Chen Decl. ¶¶ 23-24.)

Two ASPI-related entities are integral to the EB-5 project at issue in this suit. The first, EDC III, is a Washington State limited liability company founded in 2011. (Chen Decl. ¶ 26, Ex. 3 ("LLC Agreement") at 2.) ASPI is EDC III's managing member, and Mr. Chen is its registered agent. (Worland Resp. Decl. ¶ 2, Ex. 1.) EDC III is the new commercial enterprise for purposes of the EB-5 project at issue here. (Def. MSJ at 8); *see also* 8 U.S.C. § 1153(b)(5)(A). The second entity, NAFTZI, is a wholly-owned ASPI subsidiary. (Compl. ¶ 13; Answer ¶ 13.) NAFTZI is "the developing entity" of ASPI Commerce Park, an industrial and commercial complex in Moses Lake, Washington. (Chen Decl. ¶ 26, Ex. 4 ("Program Mem.") at 11.) Mr. Chen is NAFTZI's president and the sole signatory on all of NAFTZI's bank accounts. (Compl. ¶ 13; Answer ¶ 13.) NAFTZI was to function as the job-creating entity in EDC III's EB-5 project. (*See* Def. MSJ at 8; *see also* USCIS Policy Manual, Ch. 2 at 7.)

2. The Offering Documents

Prior to investing in EDC III, each foreign investor received three documents: (1) the "Subscription Agreement, Power of Attorney, and Representation Letter" ("Subscription Agreement"); (2) the "Limited Liability Company Agreement of Washington Economic Development Capital III, L.L.C." ("LLC Agreement"); and (3) the "Confidential Program Description Memorandum" ("Program Memorandum") (collectively, "the Offering Documents"). (*See* Chen Decl. ¶ 26, Ex. 2 ("Subscription Agreement"); LLC Agreement; Program Mem.) Each document explained the purpose of foreign investment in EDC III as follows:

//

Notwithstanding the authorized scope of allowable activities afforded the LLC under the statute and within this Agreement, the primary focus of the LLC will be to create a pool of capital to be used principally for Community Economic Development Loans as approved by the USCIS in 2009. . . .

The purpose of the Community Economic Development Loan(s) will be to provide a funding source for a new development project(s) within ASPI Group's approved Regional Center in Grant County, Washington, thereby enabling the [investors] to qualify as Immigrant Investors under the U.S. Immigration and Naturalization [sic] Act EB-5 visa program.

(Subscription Agreement at 2; LLC Agreement at 1-2; Program Mem. at 10-11.)

The Offering Documents further represented that investors' funds would be used to finance a specific project in satisfaction of EB-5 program requirements:  the upgrade of ASPI Commerce Park.  (Subscription Agreement at 2; LLC Agreement at 2; Program Mem. at 11.)  According to the Program Memorandum:

The Immigrant Investor's funds will be used to fund the purchase and development of the ASPI Commerce Park which includes the purchase, refinance, refurbishing and upgrade of existing ASPI Commerce Park buildings 1, 2, and 3 and the construction of ASPI Commerce Park 4, a 100,000 +/- sq. ft. tilt-concrete warehouse, distribution, and manufacturing building. . . .  The funds will be provided to North American Foreign Trade Zone Industries, LLC, a Washington Limited Liability Company (NAFTZI). . . .  The funding to NAFTZI will be used to finance, refinance, and upgrade the existing buildings (ASPI Commerce Park 1-3) and further develop the ASPI Commerce Park (construction of the 100,000 sq. ft. ASPI Commerce Park 4), including, but not limited to, extend/upgrade industrial infrastructure including sanitary sewer, municipal water, roads, electric and telecommunications facilities and rail access.

(Program Mem. at 11.)  Similarly, the LLC Agreement described the purpose of foreign investors' investments as follows:

The funding to NAFTZI will be used to finance and develop the ASPI Commerce Park 4 Building and including, but not limited to, refurbish, remodel, and refinance the existing buildings on the site (ASPI Commerce Park 1, 2, and 3) as well as extend/upgrade industrial infrastructure to the

ASPI Commerce Park 4 site.  The finished product will cause the entire ASPI Commerce Park project to remain state-of-the-art while adding an additional 100,000 square feet of warehouse/manufacturing space.  This overall improvement will involve additional infrastructure upgrades including sanitary sewer, municipal, water, roads, electric and telecommunications facilities and rail access.

(LLC Agreement at 3.)  The LLC Agreement further stated that the ASPI Commerce Park project was projected "to create 230 direct jobs and 90 indirect jobs."  (*Id.* at 5.)

According to the Offering Documents, the EDC III project would accommodate up to 31 foreign investors, each of whom would purchase a "Unit of Membership" in EDC III for $500,000.00, for a total pool of up to $15.5 million.  (Subscription Agreement at 2; LLC Agreement at 1; Program Mem. at 3.)  In addition, investors would pay $60,000.00 in fees, to be used for marketing expenses, third party commissions, and other administrative costs.  (LLC Agreement at 1; Program Mem. at 9.)  Pursuant to the Offering Documents, each investors' money would remain in escrow until USCIS approved his or her I-526 petition.  (Program Mem. at 9.)  Upon approval of the I-526 petition, the investor would become "an official Member" of EDC III.  (*Id.*)  At that point, the investor's funds would be released from escrow and "placed in the pool" for EDC III's use.  (*Id.*; *see also* Subscription Agreement at 1.)

The Offering Documents further explained that EDC III would disburse investors' money in the form of a five-year "loan" to NAFTZI, which would undertake the new development project at ASPI Commerce Park.  (Subscription Agreement at 2-3; LLC Agreement at 2-3; Program Mem. at 11.)  The loan would be secured by a first position deed of trust on ASPI Commerce Park and would accrue interest at a rate of 3.25% per

year.  (Subscription Agreement at 3; LLC Agreement at 3; Program Mem. at 11-12.)  The

Offering Documents stated that ASPI would be entitled to approximately 85% of the

interest generated on the loan.  (Subscription Agreement at 3; LLC Agreement at 3;

Program Mem. at 12; *see also* Compl. ¶ 32; Answer ¶ 32.)  The remaining interest would

be used to pay for "applicable [ASPI] expenses such as professional, consulting, legal,

overhead and accounting fees."  (Subscription Agreement at 3; LLC Agreement at 4;

Program Mem. at 12.)  Any interest in excess of such expenses would be returned to

investors.  (*Id.*)  At the end of the five-year period, NAFTZI would "refinance the ASPI

Commerce Park project from other financing sources and pay off the outstanding balance

of [the] loan" from EDC III.  (LLC Agreement at 4.)

Notwithstanding the Offering Documents' focus on the ASPI Commerce Park

project, the Offering Documents vaguely suggested that ASPI might use investors' funds

in connection with other job-creating EB-5 projects in the ASPI regional center.  For

example, the LLC Agreement stated that EDC III investors' capital would be used to

fund "Community Economic Development Loans through direct and indirect funding of

industrial commercial development along with attendant and supporting retail, financial,

and residential projects."  (*Id.* at 4-5.)  Similarly, the Program Memorandum stated that

ASPI would "review funding applications and proposals from various Qualifying

Employment Creating Commercial Enterprises" within the ASPI regional center.

(Program Mem. at 13.)  The Program Memorandum further stated that, as

investor-funded loans "[were] repaid, the 'pooled' funds [would] be replenished and

//

[could] be loaned again to other qualifying commercial enterprises[,] thereby enhancing the employment creation opportunities of the Immigrant Investor's funds." (*Id.* at 2.)

In February 2012, EDC III and NAFTZI executed an agreement on the terms of the EB-5 loan. (Chen Decl. ¶ 29, Ex. 5 ("Loan Agreement") at 1.) The agreement provided that "[t]he source of the funding [of the loan] is through the USCIS EB-5 Investor Pilot Program, and the Lender's funds are limited to the guidelines of the USCIS and the number of investors recruited." (*Id.*) The agreement further stated that "[f]unding [would] not [be] available until the immigrant investors' I-526 are approved," and that "at least 16 investors' I-526 must be approved before the borrower [NAFTZI] may draw any money from the loan." (*Id.*) Mr. Chen represents that, "a[s] promised in the 'Offering Documents[,]' the loan was secured by a first position Deed of Trust pledging ASPI Commerce Park consisting of approximately 17 acres." (Chen Decl. ¶ 29.)

Construction on Commerce Park 4 began in the fall of 2015. (Compl. ¶ 61.)[2] According to Defendants, Commerce Park 4 has been "completed precisely as described in the formation documents." (Chen Decl. ¶ 37.) Defendants contend that the new facility is "full leased" (*id.*) and assert that the project is "estimated to create 235.8 direct,

---

[2] Defendants acknowledge that construction commenced after 10 investors received I-526 approvals, rather than the 16 approvals required in the loan agreement between EDC III and NAFTZI. (Chen Decl. ¶¶ 32, 36.) Mr. Chen asserts that ASPI chose to move forward with construction in light of severe delays in processing Chinese nationals' EB-5 petitions at USCIS. (Def. Reply at 7; *see also* Chen Decl. ¶ 36 (claiming that processing delays put ASPI "in the untenable position of wanting to protect the investors that had been approved by commencing construction of the project within the qualifying time window for their approvals").)

indirect, and induced jobs" (Chen Supp. Decl. (Dkt. # 33) ¶ 2, Ex. 1 at 4).  The parties

stipulate that NAFTZI paid a total of $4,552,378.48 to the company responsible for

constructing Commerce Park 4.  (Worland Resp. Decl. ¶ 16, Ex. 15 ("Stip.") ¶ 5.)

   3.  Disbursement of Investor Funds

   Thirty nationals of China, Taiwan, and South Korea invested in EDC III.

(Worland Resp. Decl. ¶ 14, Ex. 13 ("Misuraca Rep.") at 7-8.)  Investors deposited or

wired a total of $14,534,710.00 into EDC III bank accounts.  (*Id.* at 3.)  Of that sum, $13

million represented investors' capital and $1,534,710.00 represented fees.  (*Id.*)  An

additional $2,060,100.00 was held in escrow, of which $2 million represented investors'

capital and $60,100.00 represented fees.  (*Id.*)

   The SEC's expert witness, Yasmine Misuraca, a forensic accountant, traced the

path of "all monies transferred in and out of [EDC III's] bank accounts" between May 17,

2011, and September 30, 2016.  (*Id.* at 1, 14.)  According to Ms. Misuraca's report,

"[Mr.] Chen was the sole signatory for each [EDC] III bank account" and "had sole

authority to initiate the transfer of funds from said bank accounts."  (*Id.* at 15.)  Ms.

Misuraca concluded that, as of July 31, 2015, "approximately $14,534,419, of the

$14,534,710, of [the] Investors' money had been disbursed" from the EDC III accounts.

(*Id.* at 3.)

   Ms. Misuraca tracked each disbursement of EDC III investors' funds.  (*See id.* at

23-36.)  She found that, in total, Defendants transferred approximately $7,566,535.00 in

investors' funds from EDC III to NAFTZI.  (*Id.* at 4.)  Ms. Misuraca further concluded

that Defendants disbursed approximately $6,496,780.00 in EDC III investor funds for

purposes other than the ASPI Commerce Park project.  (*Id.*)  Specifically, Ms. Misuraca found:

- Between April 2012 and June 2012, Mr. Chen transferred $1.65 million in investor funds to ASPI's TD Ameritrade account.  (*Id.* at 23.)  Mr. Chen used the investor funds to satisfy margin calls for the TD Ameritrade account, which were unrelated to the ASPI Commerce Park project.  (*Id.* at 24, 26.)  Mr. Chen received $2,400.00 in promotional gift cards, for personal use, as a result of the transfers to the TD Ameritrade account.  (*Id.* 24-25.)  Of the $1.65 million in investor funds transferred to the TD Ameritrade account, approximately $1,160,000.00 were transferred back into EDC III accounts.  (*Id.* at 26-27.)  Those funds did not remain in EDC III accounts for long, however.  (*Id.* at 27.)  Some $860,000.00 were transferred to Moses Lake 96000, an unrelated EB-5 project in the ASPI regional center.  (*Id.*)  The remainder was transferred to NAFTZI, only to be transferred, in large part, back to ASPI.  (*Id.*)  ASPI then used a portion of those funds for non-EDC III purposes, including ASPI payroll and credit card payments and other ASPI business ventures.  (*Id.*)  Ms. Misuraca concludes that of the $1.65 million in EDC III investor funds transferred to the TD Ameritrade account, $490,000.00 were never repaid to EDC III.  (*Id.* at 28.)

- In 2013, a total of $2 million in investor funds were transferred to Moses Lake 96000.  (*Id.*)  Mr. Chen testified that the transfer constituted a loan for the

purpose of completing EDC I's EB-5 project, which was unrelated to EDC III. (*Id.*)

- In March 2012, Mr. Chen transferred $150,000.00 in investor funds to his cousin, who used the funds to refinance a personal home. (*Id.* at 28-29.) Mr. Chen's cousin repaid the loan to EDC III in 2014. (*Id.*)

- In May 2012, Mr. Chen transferred $166,537.70 in investor funds to Heritage Bank, the lender to ASPI on a Fox Island, Washington venture that was unrelated to EDC III's EB-5 project. (*Id.* at 29, 38.)

- Approximately $149,018.00 in investor funds were transferred to Sun Basin Orchards, an orchard owned by John Chen. (*Id.* at 30.) Of that sum, approximately $95,768.00 were transferred directly from an EDC III bank account. (*Id.*) The remainder was first sent to ASPI and then transferred to Sun Basin Orchards. (*Id.*) Sun Basin Orchards is unrelated to EDC III's EB-5 project. (*Id.*)

- Approximately $118,250.00 in investor funds were transferred to EDC II for purposes of an EB-5 project unrelated to EDC III. (*Id.*)

- In March 2015, approximately $500,000.00 in investor funds were transferred to Timberland Bank. (*Id.*)

- From 2012 to 2013, Mr. Chen transferred investor funds from EDC III accounts to ASPI accounts to pay ASPI's corporate expenses. (*Id.* at 32.) According to Ms. Misuraca's report, $564,000.00 in investor funds were used

to pay the wages of ASPI's six staff employees; compensate Tom Chen and John Chen, ASPI board members, for insurance, transportation, dining, and other benefits; and subsidize payroll expenses, such as taxes and social security benefits. (*Id.* at 32-33.) Additionally, approximately $190,730.00 in EDC III investor funds were used to cover ASPI employees' health and dental insurance. (*Id.*) Ms. Misuraca also concluded that approximately $253,806.00 in EDC III investor funds were transferred to ASPI and then used to pay ASPI's corporate credit card bills; approximately $169,000.00 in investor funds were transferred to ASPI and then used to pay ASPI's board members; approximately $29,250.00 in investor funds were transferred to ASPI and then used to satisfy the financial obligations of other Chen family members; approximately $12,826.00 in investor funds were transferred to ASPI and then used to cover Mr. Chen's payments on a BMW; approximately $540,000.00 in investor funds were transferred to ASPI and then paid to Junping Sun, an investor in an unrelated EB-5 project administered by ASPI; and approximately $269,988.00 in investor funds were transferred to ASPI and then disbursed to persons and entities uninvolved in EDC III's EB-5 project. (*Id.* at 33-35.) Finally, Ms. Misuraca concluded that several hundred thousand dollars in investor funds were transferred to ASPI and then wired to G and L International and Rongying Wu for purposes unrelated to EDC III's EB-5 project. (*Id.* at 36.)

- Mr. Chen transferred approximately $76,500.00 from EDC III accounts directly to other persons and entities apparently uninvolved in the ASPI Commerce Park EB-5 project. (*Id.* at 31.)

- Of the approximately $7,566,535.00 in investor funds transferred to NAFTZI, approximately $705,919.00 were used for non-EDC III purposes, including ASPI's payroll and credit card expenses. (*Id.* at 37-38.)

Finally, Ms. Misuraca found that NAFTZI failed to pay interest on the EDC III loan comprising investor funds. (*Id.* at 37.) Ms. Misuraca states that she "[did] not come across a single interest payment that was made to [EDC] III from NAFTZI between 2012 through September 30, 2016, even though it appears that a total of approximately $7,566,535 had been loaned [to NAFTZI] and $583,250 ha[d] been repaid by NAFTZI at that time." (*Id.* at 37.)[3]

Defendants concede that Ms. Misuraca accurately traced each disbursement of EDC III investors' money. (*See* Def. Reply at 5; Def. Resp. at 8.) They do not provide an alternative expert report. (*See generally* Dkt.)

//

---

[3] Ms. Misuraca further opined that Mr. Chen prematurely utilized EB-5 investors' funds. (*Id.* at 17.) According to the Offering Documents, investors' funds would remain in escrow until investors' I-526 petitions were approved. (Program Mem. at 9; *see also* LLC Agreement at 1.) Ms. Misuraca found that, despite these representations, Mr. Chen disbursed approximately $1.2 million in EDC III investor funds as a loan to EDC I, and approximately $502,100.000 in EDC III investor funds as a loan to EVF, before USCIS approved those investors' I-526 petitions. (Misuraca Rep. at 18.) Neither EDC I nor EVF was involved in EDC III's EB-5 project. (*Id.* at 19.) EDC and EVF repaid the loan amounts to EDC III. (*Id.* at 19.) Relatedly, Ms. Misuraca concluded that EDC III loaned investor funds to NAFTZI before USCIS had approved any investor's I-526 petition. (*Id.* at 18.)

4. <u>USCIS Actions</u>

USCIS approved the first of the EDC III investors' I-526 petitions in January 2014. (Def. MSJ at 6; Misuraca Rep. at 18.) In total, USCIS approved 10 EDC III investors' I-526 petitions. (Chen Decl. ¶ 34; Misuraca Rep. at 18.) USCIS records suggest that USCIS has denied the remainder of EDC III investors' I-526 petitions.[4] (Worland MSJ Decl. (Dkt. # 37) ¶ 10, Ex. 9 ("Not. of Intent to Terminate") at 5.) As of June 20, 2018, seven EDC III investors had filed I-829 petitions. (*Id.* at 7.) To the court's knowledge, USCIS has not approved any I-829 petition affiliated with EDC III. (*See id.*; *see generally* Def. MSJ; Def. Reply; Def. Resp.)

In 2018, the USCIS Administrative Appeals Office ("Appeals Office") affirmed the denials of six EDC III investors' I-526 petitions in non-precedent decisions. (Worland Resp. Decl. ¶ 18, Ex. 17.1 ("*Matter of Y-L-*"); *id.*, Ex. 17.2 ("*Matter of F-C-H-*"); *id.*, Ex. 17.3 ("*Matter of Y-T-*"); *id.*, Ex. 17.4 ("*Matter of M-C-H-*"); *id.*, Ex. 17.5 ("*Matter of W-C-*"); *id.*, Ex. 17.6 ("*Matter of H-J-Y-*").) In each appeal, the Appeals Office concluded that the foreign investor was not EB-5-eligible because he or she "ha[d] not satisfied the job creation requirements." (*Matter of Y-L-* at 3; *Matter of F-C-H-* at 3; *Matter of Y-T-* at 3; *Matter of M-C-H-* at 3; *Matter of W-C-* at 3; *Matter of H-J-Y-* at 3.) Specifically, the Appeals Office found that, "although [EDC III's] business plan was

---

[4] USCIS states that 31 investors filed I-526 petitions in connection with EDC III's EB-5 project and that USCIS denied 20 of those petitions. (Notice of Intent to Deny at 5.) It is not clear whether all those petitions were denied on the merits or whether some were withdrawn. Defendants contend that USCIS figures "fail to account for petition withdrawals . . . [and] pending petitions[.]" (Def. Reply (Dkt. # 32) at 11.) The court also notes that Ms. Misuraca's report states that 30 investors, not 31, invested in EDC III. (*See* Misuraca Rep. at 7-8.)

predicated on lending investor funds to complete construction" of Commerce Park 4, NAFTZI "completed the project without the use of the [investor's] EB-5 capital." (*See, e.g.*, *Matter of Y-L-* at 3.) Additionally, the Appeals Office observed discrepancies among various estimates of the construction costs of Commerce Park 4. (*See, e.g.*, *id.* at 7.)[5] The Appeals Office concluded that, even if investors could show that NAFTZI would subsidize its purported construction expenditures with EB-5 funds, the investors' petitions would remain deficient because "the proposed loan amount is more than the alleged construction costs." (*Id.*)

The Appeals Office also focused on the Offering Documents. According to the Appeals Office, the Offering Documents appeared not to obligate EDC III to "loan the entire amount" of each investor's investment to NAFTZI. (*See, e.g.*, *id.* at 4.) The Appeals Office pointed to language in the Confidential Program Memorandum, which provided that EDC III would "loan *portions* of the pooled funds" to NAFTZI. (*Id.* (quoting Program Mem. at 4).) As a result, the Appeals Office concluded that, at the time each investor filed his or her I-526 petition, "the documentation in the record did not show" that EDC III "would make the full amount of [the investor's] $500,000 available" to NAFTZI. (*See, e.g.*, *id.* at 4.)

---

[5] EDC III investors submitted documentation to USCIS stating that the costs of constructing Commerce Park 4 amounted to $7,760,196.00. (*See, e.g.*, *id.* at 7.) The Appeals Office noted that "[t]his number does not match any previously offered construction figures." (*Id.*) Neither does this figure match the total construction costs to which the parties have stipulated. (*See* Stip. ¶ 5 (stipulating that NAFTZI expended $4,552,378.48 on construction costs for Commerce Park 4).) As the court discusses below, *see infra* Section III.C.2.a, Mr. Chen suggests that the ASPI Commerce Park project also required operating expenses and other costs not reflected in the "hard construction costs." (Chen Decl. ¶ 4.)

Separately, on June 20, 2018, USCIS issued to a "Notice of Intent to Terminate" ASPI's designation as a regional center on the ground that ASPI "no longer serves the purpose of promoting economic growth." (*See* Not. of Intent to Terminate at 3.) Citing the SEC's complaint in this action, USCIS asserted that ASPI's "use of EB-5 investor funds was not in accordance with the business plans, construction budget proposals, and Economic Impact Assessment report [that ASPI] submitted to USCIS." (*Id.* at 11.) USCIS further declared that "[ASPI]'s practice of redistributing EB-5 investors' . . . funds to other projects and activities that may be unrelated to job creation has reduced the credibility of its current project." (*Id.* at 12.) Defendants contend that the Notice of Intent to Terminate is replete with factual errors. (Def. Reply at 11-12.) They also emphasize that USCIS has yet to issue a final determination on ASPI's status as a regional center. (*Id.*)

In response to the Notice of Intent to Terminate, Mr. Chen sent a letter to USCIS defending ASPI and its EB-5 projects. (Worland MSJ Decl. ¶ 11, Ex. 10 ("Chen USCIS Letter").) Mr. Chen characterized the "diversion" of investor funds identified in the Notice of Intent to Terminate and the SEC's complaint as permissible exercises of ASPI's authority under the EB-5 program:

> Once the loan was in place and secured by the designated real property, ASPI viewed the funds as "working capital" and commingled the loan funds with funding from other ASPI sources to complete the project. This is acceptable with most government loans including the SBA and New Market Tax Credit program. This is the "diversion" of funds that the SEC action refers to—and the USCIS adjudicator refers to.

(*Id.* at 7.)

1    **C.**    **The Cross-Motions**

2       The parties' cross-motions largely hinge on whether the Offering Documents

3 contained material misrepresentations or omissions. (*See, e.g.*, Def. MSJ at 6-7, 20-21;

4 Pl. MSJ at 7-12.) Defendants contend that the Offering Documents accurately described

5 a "loan model" of EB-5 investment pursuant to which ASPI could use investor funds "in

6 a manner it determined appropriate," as long as the loan from EDC III to NAFTZI was

7 secured by a first position deed of trust in ASPI Commerce Park. (Def. MSJ at 7.) In

8 contrast, the SEC contends that it is entitled to summary judgment because Defendants

9 misrepresented that EDC III investors' capital would be used in accordance with EB-5

10 requirements, only to misappropriate millions of dollars in investor funds. (Pl. MSJ at

11 7-8.)

12            **III.**     **ANALYSIS**

13 **A.**    **Summary Judgment Standard**

14       Summary judgment is appropriate if the evidence shows "that there is no genuine

15 dispute as to any material fact and the movant is entitled to judgment as a matter of law."

16 Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.*

17 *Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). A fact is "material" if it might affect the

18 outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

19 factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

20 finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

21 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).

22 *//*

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of such a dispute in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party bears the ultimate burden of persuasion at trial, it must establish a *prima facie* showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotation marks and citation omitted). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because those are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue

for trial." *Scott*, 550 U.S. at 380 (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Accordingly, "mere allegation and speculation do not create a factual dispute for purposes of summary judgment." *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996). Nor can "[c]onclusory allegations unsupported by factual data" defeat summary judgment. *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

When deciding cross-motions for summary judgment on the same claim, the court must "rule[] on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (3d ed. 1998)); *see also ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006) ("We evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences.") (citations and internal quotation marks omitted).

**B. Securities Laws**

The SEC alleges that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. The SEC further alleges that Defendants violated Sections 17(a)(1), (2), and (3) of the Securities Act, 15 U.S.C. § 77q(a)(1)-(3). (Compl. ¶¶ 80-91.)

Section 10(b), Rule 10b-5, and Section 17(a) prohibit fraudulent conduct or practices in connection with the offer or sale of securities. *See, e.g.*, *SEC v. Dain*

*Rauscher, Inc.*, 254 F.3d 852, 855-56 (9th Cir. 2001).  Under Section 10(b), it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, which implements Section 10(b), classifies violations of the statute into three categories.  *See Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 938 (9th Cir. 2009).  Specifically, Rule 10b-5 makes it unlawful:

> (a) [t]o employ any device, scheme, or artifice to defraud[;]

> (b) [t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[;] or

> (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Section 17(a) of the Securities Act contains three subsections "substantially identical" to the provisions of Rule 10b-5.  *SEC v. Fitzgerald*, 135 F. Supp. 2d 992, 1027 (N.D. Cal. 2001) (citing 15 U.S.C. § 77q(a)).

Section 10(b), Rule 10b-5, and Section 17(a) require proof of the same essential elements.  *SEC v. Phan*, 500 F.3d 895, 907-08 (9th Cir. 2007) (citing *Rauscher*, 254 F.3d at 855-56); *see also SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (noting that "[e]ssentially the same elements are required under Section 17(a)(1)-(3)" as under Section 10(b) and Rule 10b-5).  All forbid (1) making a material misstatement or omission or employing a deceptive device or fraudulent scheme (2) in connection with the offer or sale of a security (3) by means of interstate commerce.  *Phan*, 500 F.3d at

907-08 (citing *Rauscher*, 254 F.3d at 855-56). Violations of Section 10(b), Rule 10b-5, and Section 17(a)(1) require a showing of scienter. *Rauscher*, 254 F.3d at 856 (citing *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980)). Violations of Sections 17(a)(2) and (3) require a showing of negligence. *Rauscher*, 254 F.3d at 856 (citing *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453-54 (3d Cir. 1997)).

**C.    The SEC's Motion for Summary Judgment**

The SEC moves for summary judgment on all liability issues. (SEC MSJ at 1.) According to the SEC, there is no genuine dispute of material fact that, in violation of Rule 10b-5(b) and Section 17(a)(2) of the Securities Act: (1) Defendants materially misrepresented that they would spend investor funds in accordance with the requirements of the EB-5 program; (2) those misrepresentations were made in connection with the offer or sale of securities in interstate commerce; and (3) Defendants acted with scienter. (*Id.* at 7-23.) Additionally, the SEC claims that the undisputed facts establish that Defendants' conduct constitutes an illegal scheme to defraud under Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3) of the Securities Act. (*Id.* at 24.)

1.    <u>Securities</u>

As a threshold matter, the court addresses whether membership interests in EDC III constituted "securities" within the meaning of the securities laws. The Securities and Exchange Acts define the term "security" to include, among other things, "any . . . investment contract." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). "The basic test for distinguishing transactions involving investment contracts from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise

with profits to come solely from the efforts of others.'"  *SEC v. Liu*, No. 17-55849, 2018 WL 5308171, at *1 (9th Cir. Oct. 25, 2018) (quoting *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)).  In the Ninth Circuit, shares in an EB-5 project may constitute investment contracts if foreign investors "were promised a chance to earn a profit," even if that profit "was not their primary motivation."  *Liu*, 2018 WL 5308171, at *2; *see also SEC v. Liu*, 262 F. Supp. 3d 957, 969-70 (C.D. Cal. 2017), *aff'd*, 2018 WL 5308171.

Here, the parties agree that the foreign investors' primary motivation in investing in EDC III was to obtain permanent residency.  (*See, e.g.*, Pl. MSJ at 15; Ku Decl. (Dkt. # 27) ¶ 4, Ex. 1 ("Zhang Decl.") ¶ 2.)  Nonetheless, there is no dispute that the Offering Documents promised investors a chance to earn a profit, however minimal, in the form of interest that accrued on the investor-funded loan from EDC III to NAFTZI.  (Subscription Agreement at 3; LLC Agreement at 4; Program Mem. at 12); *see also Liu*, 2018 WL 5308171, at *2 (stating that investors were promised profits in the form of interest on the investor-funded loan extended to the job-creating entity).  Accordingly, following *Liu*, 2018 WL 5308171, at *1-2, the court concludes that Defendants sold securities within the meaning of Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act.

## 2.  Material Misstatements and Omissions

The SEC asserts that there is no genuine dispute of material fact that Defendants made material misstatements and omissions in the Offering Documents "related to how the investors' money would be used to satisfy the USCIS requirements" under the EB-5

program.  (*Id.* at 4.)  The SEC further contends that those misstatements and omissions are material as a matter of law because any reasonable EB-5 investor would, at the time of investment, find it important to know whether his or her funds would be used for non-EB-5 purposes.  (*Id.* at 14-18.)  The court begins by assessing whether Defendants misstated facts in the Offering Documents or omitted facts necessary to make the Offering Documents not misleading.

### a. *Misstatements and Omissions in the Offering Documents*

In relevant part, the Offering Documents promised that Defendants would pool investors' money to fund "Community Economic Development Loan(s) . . . to provide a funding source for . . . new development project(s)" within the ASPI regional center, "thereby enabling [investors] to qualify as Immigrant Investors under the . . . EB-5 visa program."  (Subscription Agreement at 2; LLC Agreement at 2; Program Mem. at 11.) The Offering Documents further stated that each immigrant investor's capital would be channeled to NAFTZI in the form of a secured loan, and that NAFTZI—the "Qualifying Employment Creating Entity"—would use those funds to upgrade ASPI Commerce Park. (LLC Agreement at 2; *see also id.* at 5 (estimating that the ASPI Commerce Park project would create 230 direct and indirect jobs).)  In other words, the Offering Documents represented that Defendants would funnel investors' money into job creation in satisfaction of EB-5 program requirements.

That representation was false.  Defendants raised $14,534,710.00 in investor funds, of which $13 million represented investor capital and just over $1.5 million represented fees.  (Misuraca Rep. at 3.)  Defendants channeled approximately $7.5

million in investor funds to NAFTZI. (*Id.* at 4.) But Defendants misappropriated at least $6.5 million in investors' money for uses contrary to the terms and purposes of the EB-5 program. (*See id.* at 3.) Ms. Misuraca's undisputed expert report shows that Defendants used EDC III investors' money to finance unrelated EB-5 ventures, subsidize the salaries and benefits of ASPI's employees, compensate ASPI's board members, pay ASPI's corporate credit bills, and satisfy margin calls in ASPI's TD Ameritrade account. (*Id.* at 23-36.) Additionally, Defendants deployed investor funds in ways wholly unrelated to ASPI's business operations. For instance, Defendants used investors' money to cover Mr. Chen's BMW payments and satisfy the financial obligations of members of the Chen family. (*Id.* at 34-35.) In short, Defendants repeatedly offended the EB-5 program's baseline requirement that the full amount of investor capital be channeled into job creation. (*See* USCIS Policy Manual, Ch. 2 at 7.) In so doing, Defendants rendered false the Offering Documents' central premise that Defendants would utilize investors' money in such a way as to "enabl[e]" investors to qualify for EB-5 status. (*See* Subscription Agreement at 2.)

Defendants concede that Ms. Misuraca accurately traced their use of EDC III investors' money. (*See* Def. Resp. at 8 (noting Ms. Misuraca's expert report on "the use of [investors'] money . . . has never been contested by defendants"); *id.* at 13 ("Defendants have never disputed the use of funds set forth in the expert report[.]"; Def. Reply at 5 ("Defendants have never contested where or how the funds were used.").) However, Defendants assert a litany of reasons why the court should find that Defendants

//

fully complied with the terms of the Offering Documents and the EB-5 program. None

reveals a genuine issue for trial.

First, Defendants emphasize that the investor-backed loan from EDC III to

NAFTZI was secured by a first position deed of trust on ASPI Commerce Park. (Def.

Resp. at 2, 8; Def. MSJ at 15.) The argument is unavailing. To begin, the undisputed

record shows that Defendants loaned only a portion of investor funds to NAFTZI.

(Misuraca Rep. at 3-4.) Thus, contrary to Defendants' representations, some investors'

capital was not "fully secured" by an interest in real property. (*See* Def. Resp. at 3.)

Moreover, the security interest is irrelevant to whether Defendants misrepresented how

they intended to use investors' money. The first position deed of trust ostensibly

guaranteed that investors could recover their capital in the event of default (*see* Def. MSJ

at 7); it in no way ensured that Defendants would actually channel investor funds into the

ASPI Commerce Park project. Put otherwise, that Defendants afforded some investors a

security interest in real property does not immunize Defendants from liability for material

misrepresentations in the Offering Documents.

Defendants also argue that they performed under the Offering Documents exactly

what investors were promised: EDC III loaned investor funds to NAFTZI, which

completed the Commerce Park 4 project and created "hundreds" of new jobs. (Def. MSJ

at 6.)[6] As a result, Defendants contend, the court cannot find that Defendants

---

[6] Defendants do not make this argument at length in their opposition to the SEC's motion for summary judgment, but raise it in their motion for summary judgment. (*See generally* Def. Resp.; *see also* Def. MSJ at 6, 11, 18-19.) Because Defendants' opposition incorporates their motion for summary judgment (*see* Def. Resp. at 1), the court addresses the argument here.

misrepresented how they intended to use EDC III investors' funds.  (*See id.* at 18-19.)
The court disagrees.

Defendants do not contest that EDC III loaned NAFTZI only about $7.5 million of
the approximately $13 million in investor capital Defendants raised.  (*See* Misuraca Rep.
at 4.)  Defendants also concede that they expended just $4.5 million to construct
Commerce Park 4.  (Stip. ¶ 5.)  Mr. Chen suggests that the ASPI Commerce Park project
also demanded expenditures for "land, infrastructure, soft costs, project management and
operating expenses, interest, contingencies, and overhead" not reflected in the "hard
construction costs."  (Chen Decl. ¶ 4.)  But Defendants provide no evidence that they
utilized investors' money for any such expenses.  *See Rivera*, 331 F.3d at 1078
("Conclusory allegations unsupported by factual data cannot defeat summary
judgment.").  Even taking Defendants at their word, the court is left with this undisputed
fact:  the cost of the ASPI Commerce Park project amounted to significantly less than the
total investor capital Defendants raised.  (*See* Misuraca Rep. at 3; Stip. ¶ 5.)  As a result,
some EDC III investors have nothing to show for their investment in EDC III.  (*See, e.g.*,
*Matter of Y-L-* at 3 (finding that NAFTZI "completed the project without the use of [the
investor's] EB-5 capital").)  Mere completion of the project does not absolve Defendants
of misappropriating investor funds.

Relatedly, Defendants assert that the Offering Documents vested Defendants with
virtually unbounded authority to dispense investor funds as they saw fit.  Specifically,
Defendants insist that ASPI and NAFTZI "could use the loan proceeds in a manner [they]
determined appropriate under the circumstances," as long as the EDC III loan was

secured by an interest in ASPI Commerce Park.  (Def. MSJ at 7; *see also* Def. Resp. at 13

(disputing that "any use of funds was outside the scope set forth in the Offering

Documents").)  The court acknowledges that some parts of the Offering Documents

appear to contemplate the deployment of investors' capital to multiple job-creating

entities.  (*See, e.g.*, Program Mem. at 13.)  The court also observes that the Offering

Documents did not expressly guarantee that EDC III would make the entire amount of

investor funds available to NAFTZI, as the USCIS Appeals Office emphasized in

denying EDC III investors' appeals.  (*See, e.g.*, *Matter of Y-L-* at 4.)  Nonetheless, the

Offering Documents' overriding focus on the ASPI Commerce Park project, combined

with its pledge to "enabl[e] Member Managers [of EDC III] to qualify as Immigrant

Investors under . . . the EB-5 visa program," render Defendants' reading of the

Documents untenable.  (*See* Subscription Agreement at 2; LLC Agreement at 2; Program

Mem. at 11.)  Under the Offering Documents, any discretion Defendants enjoyed with

respect to investors' money was bounded by EB-5 program requirements—*i.e.*, that the

"full amount" of each investor's $500,000.00 investment be "made available" to the

entity responsible for creating the jobs on which the investor's petition is based.  (USCIS

Policy Manual, Ch. 2 at 7.)  No reasonable juror could conclude that the Offering

Documents gave Defendants a license to spend substantial sums of investors' money for

ASPI's general business expenses, unrelated EB-5 projects, and personal use.

In light of the above, the court finds that the misrepresentations in the Offering

Documents took two forms:  (1) Defendants falsely promised that they would loan each

EDC III investor's capital to NAFTZI to finance the ASPI Commerce Park project in

accordance with EB-5 program requirements; and (2) Defendants failed to disclose that they would deploy investor funds for purposes contrary to the EB-5 program, thereby rendering the Offering Documents misleading. The court now considers whether those misstatements and omissions were material.

### b. Materiality

"The antifraud provisions' materiality element is satisfied only if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Phan*, 500 F.3d at 908 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)). Materiality determinations require "delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Nevertheless, a court may resolve the issue of materiality as a matter of law when "the established omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality." *Id.* (quotation marks and citation omitted).

The district court's decision in *SEC v. Liu*, 262 F. Supp. 3d at 971-72, a securities enforcement action involving the EB-5 program, is instructive. In documents provided to foreign investors, the *Liu* defendant promised to loan investors' capital to a job-creating entity that would build and operate a cancer treatment center. *Id.* at 961. Instead of building the treatment center, the defendant diverted over $20 million in investors' money to himself, his wife, and various marketing companies. *Id.* at 960. On summary

judgment, the court found that "[s]uch vast misappropriation is fundamentally inconsistent with the EB-5 program and would dramatically undermine the project's viability and therefore threaten investors' ability to obtain visas." *Id.* at 971. Accordingly, the court concluded, "any reasonable EB-5 investor would deem the omissions and misrepresentations in the [offering documents] material." *Id.* at 971-972.

Defendants insist that *Liu* "has no applicability to the present action." (Def. Resp. at 13.) The court acknowledges that the facts of this case depart from *Liu* in certain respects. To begin, as Defendants emphasize, the foreign investors in *Liu* apparently did not hold a security interest in real property in exchange for their investment. (*Id.* at 12); *Liu*, 262 F. Supp. 3d at 961-964. Moreover, at the time the *Liu* court rendered its decision, the defendants had performed "no construction" on the cancer treatment center. *Liu*, 262 F. Supp. 3d at 964. Here, in contrast, Defendants assert that Commerce Park 4 is fully completed. (Def. Resp. at 12.)

Ultimately, however, those differences are superficial. On the issue of materiality, this case is no different from *Liu*. Foreign investors invested in EDC III because they wanted to obtain EB-5 status and, eventually, lawful permanent residency in the United States. (*See, e.g.*, Zhang Decl. ¶ 2 (stating that "the sole purpose of the investment [in EDC III] was to get green cards for my family").) In other words, but for the opportunity to earn EB-5 status, investors would not have invested in EDC III. Yet, Defendants diverted investors' funds in ways that offended the essential requirements of the EB-5 program. In so doing, Defendants may well have jeopardized numerous EDC III investors' immigration prospects. (*See Matter of Y-L-*; *Matter of F-C-H-*; *Matter of Y-T-*;

*Matter of M-C-H-*; *Matter of W-C-*; *Matter of H-J-Y-*.)  Just as in *Liu*, there is no genuine dispute that, at the time of the investment decision, a reasonable EB-5 investor would have found it important to know that Defendants would use his or her money for purposes fundamentally at odds with the EB-5 program.  *See Liu*, 262 F. Supp. 3d at 971-72.

Even construing the record in Defendants' favor, the court finds that Defendants do not provide evidence capable of raising a genuine dispute of material fact bearing on materiality.  In opposing the SEC's motion, Defendants emphasize that 10 EDC III investors, each of whom holds an approved I-526 petition, have submitted declarations that purport to approve of Defendants' handling of their investments in EDC III.  (Def. Resp. at 9; *see also* Zhang Decl; Ku Decl. ¶ 4, Ex. 2 ("Lin Decl."); *id.* Ex. 3 ("Sun Decl."); *id.* Ex. 4 ("Pan Decl."); *id.* Ex. 5 ("Wang Decl."); *id.* Ex. 6 ("Chen Decl."); *id.* Ex. 7 ("Long Decl."); *id.* Ex. 8 ("Huang Decl."); *id.* Ex. 9 ("Chung Decl."); *id.* Ex. 10 ("Kim Decl."); Zhang 2d Decl. (Dkt. # 28).)  In pertinent part, each of the 10 declarations states:

> I am fully satisfied with Andy Chen's management of my investment and his efforts to help me and my family get green cards, which is my primary investment objective. . . .
>
> My investment in [EDC III] was based upon my understanding [that EDC III] would loan funds to NAFTZI and hold a security interest in sufficient property to fully secure the loan.  Under these circumstances I have no issue with or objection to NAFTZI/ASPI utilizing loaned funds for its business or other purposes.  As a fully secured loan, NAFTZI/ASPI had control of loan proceeds and could use those proceed with other NAFTZI/ASPI assets to fulfill the obligations to the Company.

//

(Zhang Decl. ¶¶ 8, 10; Lin Decl. ¶¶ 8, 10; Sun Decl. ¶¶ 8, 10; Pan Decl. ¶¶ 8, 10; Wang Decl. ¶¶ 8, 10; Chen Decl. ¶¶ 8, 10; Long Decl. ¶¶ 8, 10; Huang Decl. ¶¶ 8, 10; Chung Decl. ¶¶ 8, 10; Kim Decl. ¶¶ 8, 10.)  Additionally, Defendants claim that several EDC III investors "ratified" Defendants' uses of investor funds after the SEC began its investigation.  (Def. Resp. at 9; Def. MSJ at 22-23; Ku Decl. ¶ 5, Ex. 11 (stating that EDC III investors "ratify and approve all actions undertaken by ASPI and its subsidiaries from and after formation of [EDC III]").)

 Neither the investor declarations nor the ratifications are relevant to the question before the court:  whether, at the time of investment, a reasonable EB-5 investor would have found that the misrepresentations and omissions in the Offering Documents altered the "total mix" of information available to that investor.  *See Phan*, 500 F.3d at 908.  To begin, the declarations offer *post hoc* endorsements of Defendants' conduct, written by the few EDC III investors whose I-526 petitions USCIS approved.  They do not speak to the mind of a prospective EDC III investor at the time of the investment decision.  *See, e.g.*, *SEC v. Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d 1091, 1097 (S.D. Cal. 2008) (noting that information is material if "a reasonable investor would want to know [it], *before* making an investment decision") (emphasis added); *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980) (stating that the materiality inquiry must reflect the viewpoint of a "prospective purchaser").  The ratifications suffer the same defect.  Relatedly, the declarations and ratifications are silent on the immigration-related implications of Defendants' misappropriation of investor funds.  Unsurprisingly, no investor suggests that he or she would have invested in EDC III even if the investor had known that

Defendants would deploy investor funds for non-EB-5 purposes. Finally, to the extent the declarants sanction Defendants' use of investor funds for ASPI's general operational expenses and "other purposes," they premise that approval upon the existence of "a security interest in sufficient property to fully secure the loan" from EDC III to NAFTZI. (*See, e.g.*, Zhang Decl. ¶ 10.) Yet, the SEC's uncontroverted evidence shows that Defendants loaned only a little more than half of investors' funds to NAFTZI, apparently rendering some investors' funds not fully secured. (*See* Misuraca Rep. at 3-4.) On this point, then, the declarations actually favor the SEC.

In sum, construing the evidence in the light most favorable to Defendants, the court finds that there is no genuine dispute that Defendants misrepresented in the Offering Documents that they would use investors' funds in accordance with EB-5 program requirements, such that investors would become eligible to seek EB-5 status. Moreover, the court concludes that those misrepresentations were material as a matter of law.

### 3. In Connection with the Sale of Securities

The SEC argues there is no genuine dispute of material fact that Defendants made the misrepresentations in the Offering Documents "in connection with" the sale of securities. (Pl. MSJ at 12-13 ("The 'in connection with' element is met here because Defendants' misrepresentations coincided with the Defendants' sales of membership interests in EDC III.").) The court agrees.

"[A] 'misrepresentation or omission of material fact' is made 'in connection with the purchase or sale' of a security when the 'fraud coincided with the sales [or purchases]

themselves.'" *Chadbourne & Park LLP v. Troice*, 571 U.S. 377, 404 (2014) (quoting *SEC v. Zandford*, 535 U.S. 813, 820 (2002)) (alterations in original).  Defendants concede that foreign investors received the Offering Documents before investing in EDC III.  (Def. Resp. at 18.)  Thus, there is no dispute that Defendants made the misrepresentations in the Offering Documents in connection with investors' purchase of membership interests in EDC III.  *See Chadbourne*, 571 U.S. at 404.

### 4. By Means of Interstate Commerce

The SEC further argues there is no dispute that Defendants used means of interstate commerce to defraud EDC III investors.  Specifically, the SEC contends that Exhibit 2 to Ms. Misuraca's expert report, a spreadsheet documenting the flow of investor funds, establishes that "essentially all of the EDC III investor deposits came into the ASPI/EDC III bank account through wire transfers."  (Pl. MSJ at 18 (citing Worland MSJ Decl. ¶ 12, Ex. 11 ("Misuraca Rep. Ex. 2")).)  Defendants acknowledge "that all of the EDC III investor deposits came into the ASPI/EDC III bank account through wire transfers."  (Def. Resp. at 18.)

In a securities fraud case, a plaintiff may satisfy the interstate requirement by demonstrating that Defendants used the banking system—or any other instrumentality of interstate commerce—"in furtherance of the alleged fraud."  *Hilton v. Mumaw*, 522 F.2d 588, 602 (9th Cir. 1975) (emphasizing that the use of an instrumentality of interstate commerce need not itself be a fraudulent act); *see also Shepherd v. S3 Partners, LLC*, No. C-09-01405 RMW, 2011 WL 4831194, at *6 (N.D. Cal. Oct. 12, 2011) (denying summary judgment on jurisdictional grounds to the defendants in a securities fraud

action, where the plaintiffs showed that the defendants obtained the funds at issue via

wire transfer).  Here, the SEC's uncontroverted evidence establishes that Defendants

obtained virtually all investor funds by means of wire transfers.  (*See* Misuraca Rep. Ex.

2.)  The court thus finds Defendants used the banking system "in furtherance of" their

misrepresentations to foreign investors and that the interstate commerce requirement is

satisfied.  *See Hilton*, 522 F.2d at 602.

    5.  Scienter

    To prove that a defendant violated Section 10(b) of the Exchange Act, Rule 10b-5,

or Section 17(a)(1) of the Securities Act, the SEC must show that the defendant acted

with scienter.  *See, e.g.*, *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003).  In contrast,

negligence suffices to support a violation of Sections 17(a)(2) and (3) of the Securities

Act.  *See Rauscher*, 254 F.3d at 856 (citing *Hughes Capital*, 124 F.3d at 453-54); *see also*

15 U.S.C. § 77q(a)(2)-(3).  The SEC asserts that there is no genuine dispute of material

fact that Defendants acted with scienter in misleading EDC III investors about the

intended uses of investors' funds.  (Pl. MSJ at 18-23.)

    "Scienter can be established by intent, knowledge, or in some cases

'recklessness.'"  *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir.

2010) (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990)

(en banc)); *see also Vernazza*, 327 F.3d at 860 (explaining that scienter may be

established by "'knowing or reckless conduct,' without a showing of 'willful intent to

defraud'") (quoting *Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978)).

Recklessness constituting scienter "is conduct that consists of a highly unreasonable act,

or omission, that is an 'extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Rauscher*, 254 F.3d at 856 (quoting *Hollinger*, 914 F.2d at 1569). In other words, "[s]cienter may be established . . . by showing that the defendants knew their statements were false, or by showing that [the] defendants were reckless as to the truth or falsity of their statements." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010). Scienter thus implicates "'a subjective inquiry' turning on 'the defendant's actual state of mind.'" *Platforms Wireless*, 617 F.3d at 1093 (quoting *Gebhart*, 595 F.3d at 1042).

The SEC argues that three pieces of evidence establish that Mr. Chen acted with scienter. (*See* Pl. MSJ at 20-23.) First, the SEC furnishes the minutes of a 2009 ASPI board meeting in which Mr. Chen described his understanding of permissible uses of investors' EB-5 funds. (Worland MSJ Decl. ¶ 16, Ex. 15 ("ASPI Minutes").) Specifically, Mr. Chen stated:

> Provided that the loan is not in default and the security for the note is in effect, the use of the promissory note funds is, basically, unrestricted. Given the environment that ASPI is a very small company, this provides ASPI with the accounting flexibility to combine vendor accounts, payables, receivables, and payroll expenses into single accounts. Of course, internal accounting would still be maintained to track funding from each regional center investor pool, but would allow ASPI complete discretion during the five year loan period to allocate borrowed funds as it saw fit and to make decisions on how revenues (leasing income) and related expenses are allocated.

(*Id.* at 6.) Mr. Chen went on to declare that ASPI would enjoy "flexibility . . . to place excess funds in temporary/short-term uses or to move funds between projects as may be deemed necessary to accommodate short term cash flow management." *Id.* Additionally,

the SEC submits portions of Mr. Chen's deposition in which he conceded that he never sought the advice of attorneys or others familiar with the EB-5 program to ensure that his understanding of ASPI's discretion to spend investor funds accorded with EB-5 requirements. (Worland MSJ Decl. ¶ 17, Ex. 16 ("Chen Dep.") at 170:3-171:12.) Finally, the SEC draws attention to Mr. Chen's letter to USCIS in response to the Notice of Intent to Terminate ASPI's regional center status. In that letter, Mr. Chen defended his use of EB-5 investor funds as "'working capital'" and acknowledged that he "commingled the loan funds with funding from other ASPI sources." (Chen USCIS Letter at 7.)

Defendants provide no additional evidence bearing Mr. Chen's intent or state of mind. (*See generally* Def. Resp.; Def. MSJ.) Rather, Defendants again fixate upon the security interest in real property that EDC III investors purportedly enjoyed. (Def. Resp. at 21-22.) According to Defendants, the 2009 ASPI board meeting minutes "explain the intent to restructure the ASPI Regional Center from an 'equity model' to a 'loan model'" under which investors' capital contributions would be secured by an interest in real property. (*Id.* at 21.) Defendants further suggest that "the fact that the EDC III loan is fully and completely secured" precludes the court from granting summary judgment to the SEC on the issue of scienter. (*Id.* ("Why would a party intending to defraud investors and use their money for 'something else' provide a fully collateralized deed of trust security interest in real estate fully protecting the investors['] investment and providing private remedies in the event of default?").) Put otherwise, Defendants appear to suggest they held a subjective, good faith belief that there was nothing wrong with using

investors' funds for non-EB-5 purposes as long as those funds remained fully secured. (*See id.*)

The court is not persuaded that EDC III investors' purported security interest in ASPI Commerce Park is relevant to the scienter inquiry. The first position deed of trust ensured that investors would not walk away emptyhanded in the event of default. It has no bearing on whether Defendants recklessly disregarded the risk that the Offering Documents' assurances of compliance with the EB-5 program were false or misleading. Just as the fact that investors held a security interest in real property cannot immunize Defendants from liability for false and misleading representations in the Offering Documents, it cannot operate to neutralize scienter. In any event, as emphasized above, the SEC's uncontroverted evidence shows that Defendants did not loan all of the EDC III investors' funds to NAFTZI (*see* Misuraca Rep. at 3-4), leaving some investors not secured in the full amount of their investment.

Construing the record in the light most favorable to Defendants, the court concludes that there is no genuine dispute that Defendants acted with recklessness constituting scienter. To begin, the court finds that the objective unreasonableness of Defendants' conduct raises an inference of scienter. *See Gebhart*, 595 F.3d at 1041 (explaining that a court "may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter"). Mr. Chen's statements in the ASPI board meeting and letter to USCIS demonstrate that he solicited EB-5 investors' money with the subjective intent to deploy those funds at ASPI's "complete discretion," contrary to the terms of the EB-5 program. (*See* ASPI Minutes at 6; *see also* Chen USCIS Letter at

7.)  By any measure, Mr. Chen's understanding of his control over EB-5 investors' funds was objectively unreasonable:  it contravened the EB-5 program's core requirement that the full amount of an EB-5 investor's capital contribution be channeled into the entities responsible for creating the employment upon which the investor's petition is based.  (*See* USCIS Policy Manual, Ch. 2 at 7.)

The court further concludes that no reasonable juror could doubt that Mr. Chen was "consciously" reckless in disregarding the risk that the Offering Documents' assurances of compliance with the EB-5 program were false.  *See Platforms Wireless*, 617 F.3d at 1093.  Even assuming Mr. Chen held a good faith belief that he could discretionarily spend EB-5 funds as working capital, certain expenditures of EDC III investors' money were so obviously beyond the pale—*i.e.*, payments on his BMW and loans to family members—that Mr. Chen "must have been aware" that he was falsifying the Offering Documents' representations to foreign investors.  *Id.* (quoting *Hollinger*, 914 F.2d at 1569); *see also Roth v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 46 n.13 (2d Cir. 1978) (stating that "[a] refusal to see the obvious, a failure to investigate the doubtful, if sufficiently gross," may furnish evidence of scienter).  In diverting investors' money for unquestionably personal purposes, Mr. Chen not only violated the essential terms of the EB-5 program, but also contravened the unreasonably liberal understanding of permissible uses of EB-5 funds he expressed in the ASPI board meeting.  (*See* ASPI Minutes at 6.)  Such disregard is "more egregious than even 'white heart/empty head' good faith," *Hollinger*, 914 F.2d at 1569, and establishes beyond genuine dispute that Mr. Chen acted with recklessness constituting scienter.

More broadly, the uncontroverted evidence shows that Mr. Chen knew that he could not verify the truth of the Offering Documents' central premise that Defendants would spend investors' funds in such a way as to "enabl[e]" investors to qualify for EB-5 status. (*See* Subscription Agreement at 2.) A defendant's failure to perform a "meaningful independent investigation to confirm the truth of [the defendant's] representations" to investors may establish that the defendant was "consciously aware that [he] lacked sufficient information for [his] statements." *Gebhart*, 595 F.3d at 1044. That, in turn, may support a finding of scienter. *Id.*; *see also SEC v. Bremont*, 954 F. Supp. 726, 730 (S.D.N.Y. 1997) (stating that a defendant may act with scienter where the defendant fails to "make the slightest attempt to verify" fraudulent information given to investors).

Such is the case here. At his deposition, Mr. Chen expressed little confidence that his conception of the "loan model" of EB-5 investment accorded with USCIS requirements; he conceded that it was "kind of [his] understanding" that USCIS sanctioned discretionary spending of EB-5 investors' money. (Chen Dep. at 167:25.) Yet, Mr. Chen failed to consult with an attorney—or anyone else—to ensure that such unfettered control over investor funds was consistent with the EB-5 program and federal securities laws. (*Id.* at 164:10-165:11, 170:3-171:12.) In other words, Mr. Chen did nothing to confirm the truth of the Offering Documents' assurance that Defendants would abide by the requirements of the EB-5 program—despite soliciting millions of dollars of other people's money for a project with potentially decisive consequences for those individuals' immigration prospects. In light of those omissions, any reasonable juror

1 would conclude that Mr. Chen acted with conscious or deliberate recklessness in

2 disregarding the risk that the Offering Documents' representations were false. *See*

3 *Gebhart*, 595 F.3d at 1042-44. Accordingly, the SEC is entitled to summary judgment on

4 the issue of scienter.

5 By extension, the court finds that Defendants acted with negligence in violation of

6 Sections 17(a)(2) and (3) of the Securities Act. For the reasons discussed above, there is

7 no genuine dispute that Defendants "depart[ed] from the standards of ordinary care" in

8 misrepresenting the intended uses of investors' funds. *Liu*, 262 F. Supp. 3d at 972. Any

9 reasonable solicitor of EB-5 funds would have ensured that he understood the permissible

10 uses of investors' money and that documents given to potential investors accurately

11 reflected how he planned to spend that money. The undisputed evidence establishes that

12 Mr. Chen failed to consult anyone with knowledge of the EB-5 program about

13 permissible uses of investors' money; failed to accurately represent how Defendants

14 intended to use investors' money; and failed to channel the full amount of EDC III

15 investors' capital contributions into job-creating entities, contrary to the essential

16 requirements of the EB-5 program. *See supra* Sections III.C.2. The SEC is thus entitled

17 to summary judgment on the issue of negligence.

18     6. Device, Scheme, or Artifice to Defraud

19 The SEC also moves for summary judgment on their claims that Defendants'

20 conduct constituted an illegal scheme to defraud under Rule 10b-5(a) and (c) and

21 Sections 17(a)(1) and (3) of the Securities Act. (Pl. MSJ at 24.) "Under Rule 10b-5(a) or

22 (c), a defendant who uses a 'device, scheme, or artifice to defraud,' or who engages in

'any act, practice, or course of business which operates or would operate as a fraud or deceit' may be liable for securities fraud." *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) (quoting 17 C.F.R. § 240.10b-5). Sections 17(a)(1) and (3) of the Securities Act similarly prohibit "scheme liability." *SEC v. Fraser*, No. CV-09-00443-PHZ-GMS, 2009 WL 2450508, at *9 (D. Ariz. Aug. 11, 2009); *see also Fitzgerald*, 135 F. Supp. 2d at 1028-29 (distinguishing between misstatements and omissions constituting violations of Rule 10b-5(b) and Section 17(a)(2), on the one hand, and scheme liability under Rule 10b-5(a) and (c) and Section 17(a)(1) and (3), on the other).

"Courts have generally held that 'a Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b-5(b) claim.'" *WPP Lux.*, 655 F.3d at 1057 (quoting *Lautenberg Found. v. Madoff*, No. 09-816 (SRC), 2009 WL 2928913, at *12 (D.N.J. Sept. 9, 2009)). Rather, "[a] defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *WPP Lux.*, 655 F.3d at 1057; *see also SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) ("Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.").

The SEC fails to explain how Defendants' alleged scheme to defraud EB-5 investors "hinge[d] on the performance of an inherently deceptive act" distinct from the misrepresentations in the Offering Documents. *See id.*; (*see generally* Pl. MSJ.)

1    Accordingly, the court finds that the SEC is not entitled to summary judgment on their

2    claims under Rule 10b-5(a) and (c) and Sections 17(a)(1) and (3) of the Securities Act.

3                                        * * *

4         In sum, the court finds there is no genuine dispute of material fact that Defendants,

5    acting with scienter, made material misrepresentations and misleading omissions in

6    connection with the sale of securities by means of interstate commerce.  Accordingly, the

7    court GRANTS summary judgment to the SEC on its claims under Rule 10b-5(b) and

8    Section 17(a)(2) of the Securities Act.  The court DENIES the SEC's motion for

9    summary judgment on the SEC's claims Rule 10b-5(a) and (c) and Sections 17(a)(1) and

10   (3) of the Securities Act.[7]

11   **D.    Defendants' Motion for Summary Judgment**

12        Defendants argue that they are entitled to summary judgment because the Offering

13   Documents contain no material misstatements or omissions as a matter of law and the

14   SEC adduces no evidence that Defendants acted with "intent to defraud."  (Def. MSJ at

15   20-21.)  Additionally, Relief Defendants assert that they are "[i]mproperly [j]oined."  (*Id.*

16   at 23.)  In light of the court's decision on the SEC's motion for summary judgment, the

17   court DENIES Defendants' motion for summary judgment with respect to material

18   //

---

19   [7] In its reply, the SEC moves to strike portions of the third declaration of Mr. Chen

20   and the declaration of immigration lawyer Duncan Millar, which are submitted in support of Defendants' opposition to the SEC's motion for summary judgment.  (Pl. Reply at 7-9; *see also* Chen Resp. Decl. (Dkt. # 40); Millar Decl. (Dkt. # 41).)  The court finds the challenged portions

21   of Mr. Chen's declaration and Mr. Millar's declaration do not alter the court's determination of the merits of the SEC's summary judgment motion.  Accordingly, the court DENIES as moot the

22   SEC's evidentiary objections.

misrepresentations and scienter. *See supra* Section III.C. The court proceeds to assess Relief Defendants' motion.

In civil enforcement actions brought by the SEC, federal courts may grant "any equitable relief that may be appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5), including disgorgement of the gains obtained from securities law violations, *see, e.g.*, *Platforms Wireless*, 617 F.3d at 1096. "Courts may also exercise their broad equitable powers to order disgorgement from non-violating third parties who have received proceeds of others' violations to which the third parties have no legitimate claim." *SEC v. World Capital Mkt., Inc.*, 864 F.3d 996, 1003 (9th Cir. 2017). Such non-violating third parties are referred to as "relief defendants" or "nominal defendants." *Id.* at 1003-04. "Although the paradigmatic example of a nominal defendant is 'a bank or trustee [that] has only a custodial claim to the property,' . . . the term is broad enough to encompass persons who are in possession of funds to which they have no rightful claim, such as money that has been fraudulently transferred by the defendant in the underlying securities enforcement action." *SEC v. Ross*, 504 F.3d 1130, 1141 (9th Cir. 2007) (quoting *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998)); *see also SEC v. Hickey,* 322 F.3d 1123, 1130-32 (9th Cir. 2003) (upholding the district court's exercise of jurisdiction over a corporation nominally owned by the defendant's mother and into which the defendant channeled proceeds of his securities violations).

To obtain relief against a relief defendant, the SEC must demonstrate: (1) the relief defendant "received ill-gotten funds"; and (2) the relief defendant "do[es] not have a legitimate claim to those funds." *World Capital*, 864 F.3d at 1004; see also *Colello*,

139 F.3d at 677. "Performing services in exchange for compensation is a sufficient claim of ownership to preclude relief defendant treatment." *U.S. Commodity Futures Trading Comm'n v. WeCorp, Inc.*, 848 F. Supp. 2d 1195, 1202 (D. Haw. 2012) (citing *Ross*, 504 F.3d at 1142). "A claim of ownership is not legitimate where the relief defendant holds the funds in trust for the primary violator, the ownership claim is a sham, the relief defendant acted as a mere conduit of proceeds from the underlying statutory violation, or some similar specious claim to ownership." *WeCorp, Inc*, 848 F. Supp. 2d at 1202 (citing *Ross*, 504 F.3d at 1141-42).

The SEC adduces no evidence that PIA, a Washington State company controlled by Mr. Chen (*see* Compl. ¶ 19), received ill-gotten funds to which it has no legitimate claim. In the complaint, the SEC alleges that PIA received proceeds from investor funds that Mr. Chen funneled into ASPI's TD Ameritrade account. (*Id.* ¶ 50.) Nonetheless, Ms. Misuraca's report does not state that PIA ever received EDC III investors' funds or proceeds arising from those funds (*see generally* Misuraca Rep.), and the SEC directs the court to no evidence to that effect (*see generally* Pl. Resp.). Because the SEC has failed to allege facts supporting the court's exercise of jurisdiction over PIA, the court finds PIA is entitled to summary judgment. *See Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (stating that allegations in the complaint are insufficient to defeat summary judgment).

Nonetheless, the SEC provides sufficient evidence to raise genuine issues of fact as to whether the remaining Relief Defendants received ill-gotten funds to which they were not entitled. According to Ms. Misuraca's report, between 2011 and 2016,

Defendants channeled EDC III investor funds for non-EDC III purposes to EDC I (Misuraca Rep. at 18), EDC II (*id.* at 30), Moses Lake 96000 (*id.* at 28), EVF (*id.* at 18), and Sun Basin Orchards (*id.* at 27, 30). Defendants also used EDC III investor funds to compensate Heidi Chen, an ASPI employee, and John Chen, Tom Chen, and Bobby Chen, ASPI board members. (*Id.* at 32-34.)

Relief Defendants do not dispute that they received funds from EDC III. (*See generally* Def. MSJ.) Nor do they provide evidence that any Relief Defendant performed services for EDC III for which they would be entitled to compensation. (*See generally id.*); *see also WeCorp, Inc.*, 848 F. Supp. 2d at 1202. Rather, Relief Defendants argue that any EDC III investor funds they obtained were transferred "in the ordinary course of business," such that they enjoy "presumptive title to the funds at issue." (*Id.* at 23-24.) That position necessarily assumes ASPI's ordinary course of business did not involve violations of securities laws. As discussed above, however, Defendants acquired EDC III investor funds in violation of Rule 10b-5(b) and Section 17(a)(2) of the Securities Act. *See supra* Section III.C. Accordingly, Relief Defendants may not have "a legitimate claim" to EDC III investor funds. *See World Capital*, 864 F.3d at 1004 (explaining that "[r]elief defendants cannot defeat jurisdiction simply by asserting an ownership interest in the disputed funds").

The SEC states it will seek further proceedings to determine remedies. (Pl. MSJ at 1.) In future proceedings, the court may examine whether any Relief Defendant has a legitimate claim to funds found to be the proceeds of securities fraud. *Cf. World Capital*, 864 F.3d at 1005-06 (finding that the district court appropriately held an evidentiary

hearing to adjudicate "the legal and factual validity" of the relief defendants' claims to the disputed funds "to determine whether it had jurisdiction over them as relief defendants"). For purposes of Relief Defendants' present motion, however, the court concludes that there remain genuine disputes of material fact as to whether Relief Defendants—with the exception of PIA—are properly before the court. The court therefore GRANTS in part and DENIES in part Relief Defendants' motion for summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part the SEC's motion for summary judgment (Dkt. # 36) and GRANTS in part and DENIES in part Defendants' and Relief Defendants' motion for summary judgment (Dkt. # 25).

Dated this 15th day of February, 2019.

The Honorable James L. Robart
U.S. District Court Judge